IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

```
_____
                                )
UNITED STATES OF AMERICA,       )
                                )
          Plaintiff,            )
                                )
vs.                             )   Case No.:  8:21-CR-61
                                )
EMRAH KUC,                      )
                                )
          Defendant.            )
_____)
```

**MOTION PROCEEDINGS**
**BEFORE THE HONORABLE CHRISTOPHER P. TUITE**

**April 5, 2021**
**9:04 a.m. to 10:41 a.m.**

**APPEARANCES:**

**FOR THE PLAINTIFF:**          CANDACE G. RICH, ESQUIRE
                                United States Department of Justice
                                Office of the United States Attorney
                                400 North Tampa Street
                                Suite 3200
                                Tampa, Florida 33602

**FOR THE DEFENDANT:**          JASON M. MAYBERRY, ESQUIRE
                                The Mayberry Law Firm, LLC
                                3630 West Kennedy Boulevard
                                Tampa, Florida 33609

**ALSO PRESENT:**               EMRAH KUC, DEFENDANT
                                MIKE McCLUNG, U.S. MARSHAL

(Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.)

**REPORTED BY:**
Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813 ) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

**INDEX**

**DEFENDANT'S WITNESSES**                                          **PAGE**

SHEIKH ABDULLAH, MD
Direct Examination by Mr. Mayberry                                    10
Cross-Examination by Ms. Rich                                         29

**GOVERNMENT'S WITNESSES**                                          **PAGE**

JOEL JOHNSON
Direct Examination by Ms. Rich                                        37
Cross-Examination by Mr. Mayberry                                     43

Rebekah M. Lockwood, RDR, CRR
Official Court Reporter
(813 ) 317-8286 | r.lockwooduscr@gmail.com
P.O. Box 173496, Tampa, Florida 33672

1         (Call to Order of the Court)

2              THE COURT:  Good morning, everyone.

3              Madam Clerk, if you could please call the case.

4              THE COURTROOM DEPUTY:  Matter of United States of

5    America versus Emrah Kuc, Criminal Case No. 20-CR-61.

6              THE COURT:  If I could please have the appearances

7    for counsel for the record, beginning with the government.

8              MS. RICH:  Good morning, Your Honor.  Candace Rich

9    for the United States.

10             THE COURT:  Good morning.

11             MR. MAYBERRY:  Good morning, Your Honor.  Jason

12   Mayberry for Emrah Kuc.

13             THE COURT:  Good morning, Mr. Mayberry.

14             Good morning, Ms. Kuc.

15             THE DEFENDANT:  Good morning.

16             THE COURT:  I'll begin with the government, Ms. Rich.

17   I think we had left off the other day with the possibility of

18   calling a witness today.  Where do you stand with that?

19             MS. RICH:  So I have one witness.  His name is Joel

20   Johnson.  He's with the Pinellas County Jail.  And he can speak

21   to what accommodations the jail can make regarding Ms. Kuc's

22   medical needs.  I spoke with Mr. Mayberry and Mr. Johnson.  We

23   were on the phone together last Thursday morning, and we had a

24   conversation about what generally those needs would be.  And

25   Mr. Johnson can address the Court on those issues today.

1          I think Mr. Mayberry and I thought would be the most

2   productive and efficient way to do this would be to have the --

3   to call Mr. Johnson and have him on the phone while

4   Mr. Mayberry is questioning the doctor he intends to call so

5   that Mr. Johnson can hear directly from a doctor as to what the

6   medical needs are.  And if Mr. Johnson has questions for the

7   doctor, as to things the jail might need in order to

8   accommodate the medical requirements of Ms. Kuc, then

9   Mr. Johnson can ask those questions of the doctor rather than

10  trying to ask Mr. Mayberry or myself questions that we may not

11  know the answer to.

12          THE COURT:  Okay.  Mr. Mayberry?

13          Thank you, Ms. Rich.

14          MR. MAYBERRY:  Your Honor, that's accurate.  I have

15  been, I feel like, to the ends of the Internet trying to find a

16  plastic surgeon that's qualified to come before the Court, at

17  least what I believe would be qualified.

18          I would be calling Dr. Sheikh Ahmed Abdullah, who is

19  a local plastic surgeon in Tampa.  His background is from

20  Fargo, North Dakota.  He's performed -- I believe he'll testify

21  that he's performed a couple hundred of these procedures that

22  Ms. Kuc has undergone.  I will have to call him through

23  WhatsApp because he's actually on vacation in Pakistan.  When I

24  originally called his office, they had him call me on a land

25  line.  I wasn't able to really hear him.  But I've been

1    communicating with him through WhatsApp.  So if Your Honor

2    would allow for that, I can call him through the WhatsApp on my

3    phone and then do the -- you know, go through a speaker.  And

4    then, of course, as Ms. Rich had just recommended -- I think

5    that's the most objective and that's the easiest way for Your

6    Honor to get the information that you need in order to assess

7    the motion.

8            THE COURT:  Just so I understand how you anticipate

9    this would work, you would call the physician in Pakistan and

10   you would place -- it's a he?

11           MR. MAYBERRY:  Yes.

12           THE COURT:  You would place him on speakerphone and

13   address him with questions after we swore him in?

14           MR. MAYBERRY:  Correct.

15           THE COURT:  Okay.  Ordinarily, it's a bit unorthodox

16   to have two witnesses on at the same time.  Ms. Rich, I take it

17   from your comments that you believe that to be necessary to

18   have Mr. Johnson here, a Pakistani doctor in order to ask

19   questions of the Pakistani doctor.  It's not something that you

20   could do yourself by way of cross?

21           MS. RICH:  Well, my concern is something might get

22   lost in translation or if I don't restate something that the

23   doctor has said to the satisfaction of Ms. Kuc or Mr. Mayberry,

24   then we might run into some issues.  So I think it makes the

25   most sense to have a medical doctor who performs these

1   procedures speak directly to the jail staff member who's in the

2   position to know whether or not the jail can accommodate

3   Ms. Kuc's current needs.

4            THE COURT:  And just in terms of the approach here,

5   it envisioned that the physician in Pakistan would complete

6   what he has to say upon your questioning and then Mr. Johnson

7   could then ask questions of the physician at that point?

8            MS. RICH:  I certainly have no objection to that.

9            MR. MAYBERRY:  I don't have an objection -- no, Your

10  Honor, I don't have an objection to that either.  I think the

11  way I had envisioned this would be Dr. Abdullah tells Your

12  Honor what he would normally do with respect to these

13  procedures, postoperative care.  He has heard from me in terms

14  of where Ms. Kuc is in terms of ability to dilate since she's

15  been in jail, and based upon that, he could opine, you know, in

16  a situation like this, this is what I think, or this is what I

17  believe.  And then Joel Johnson could hear that testimony, and

18  then at that point, he could say, well, we can either

19  accommodate this specific need or we can't accommodate this

20  specific need.

21           And then ultimately under the totality of the

22  testimony, Your Honor could then, I guess, decide on whether or

23  not we've cleared the hurdle of new information for the Court

24  and then moving into the -- you know, either moving into the

25  next stage of arguing for a bond or failing to meet the burden,

1    if that makes sense.

2              THE COURT:  All right.  Well, I suppose that's one

3    way to look at it.  It's worth a try.  Here's what I'll direct

4    the bar to do.

5              Mr. Mayberry, if you take the lead as if conducting a

6    direct examination of Dr. Abdullah, and then, Ms. Rich,

7    effectively allow Mr. Johnson to ask questions akin to a

8    cross-examination.  If you have any additional follow-up with

9    Dr. Abdullah, you can pursue that in conjunction with

10   Mr. Johnson either after conferring privately with Mr. Johnson

11   or, if you wish, over the phone.

12             And then once that's completed, Mr. Mayberry, if you

13   have redirect, or matters like that that you wish to address,

14   then we can handle it like we would a normal witness.

15             And then, Ms. Rich, you can elect at that point, once

16   Dr. Abdullah is completed, his testimony, if you wish to call

17   Mr. Johnson independently as a stand-alone witness, for lack of

18   a better term, and then address whatever you believe is

19   appropriate to address in that regard.

20             Mr. Mayberry, obviously, you can cross-examine

21   Mr. Johnson at that point as well.

22             Any objection to pursuing it in that fashion,

23   Ms. Rich?

24             MS. RICH:  No, Your Honor.

25             THE COURT:  Okay.  Mr. Mayberry?

                    UNITED STATES DISTRICT COURT

```
 1          MR. MAYBERRY:  You, Your Honor, I don't have any
 2   objection to that.  One, just for purposes of efficiency, I've
 3   got Dr. Abdullah's CV.  I've shown this to Ms. Rich.  Do you
 4   want -- do you have any objection if we just go into
 5   questioning?
 6          THE COURT:  Mr. Mayberry, I understand that there's a
 7   bit of informality in terms of how we structure this, but if
 8   you could address your questions to the Court.
 9          MR. MAYBERRY:  Sure.  I'm sorry.
10          THE COURT:  That's okay.
11          MR. MAYBERRY:  I was initially asking if she has an
12   objection.  If Your Honor -- for efficiency, if Your Honor
13   would like me to qualify him and walk through his history and
14   background, I'm certainly happy to do that.  If the government
15   would stipulate and Your Honor would possibly take judicial
16   notice of his CV, we can bypass that and go directly into the
17   questioning or I can qualify him.
18          THE COURT:  I think it's important that you at least
19   address his qualifications --
20          MR. MAYBERRY:  Sure.
21          THE COURT:  -- on the record.  If you'd like to
22   submit his curriculum vitae after the hearing by way of a
23   filing --
24          MR. MAYBERRY:  Yeah.
25          THE COURT:  -- that would, I think, be the most
```

```
 1    appropriate way of doing it.
 2              MR. MAYBERRY:  Okay.
 3              THE COURT:  With that, anything further before I have
 4    Mr. Mayberry call Dr. Abdullah?
 5              Ms. Rich?
 6              MS. RICH:  No, Your Honor.  I have Mr. Johnson's
 7    number whenever we're ready to call him.
 8              THE COURT:  Okay.  Why don't we bring in
 9    Dr. Abdullah, and then we'll want to swear in Dr. Abdullah and
10    then swear in Mr. Johnson.
11              MS. RICH:  Okay.
12              MR. MAYBERRY:  I powered down my phone, Your Honor.
13    Give me --
14              THE COURT:  That's okay.
15              MR. MAYBERRY:  Your Honor, for purposes of this call,
16    where do you prefer?  I don't -- this is a question -- if I
17    have him on speakerphone, what makes the most sense for the --
18    in terms of what the Court's ability is to hear and for the
19    court reporter for the record?
20              THE COURT:  I think we may have to go with the
21    trial-and-error approach.  Perhaps if you could bend the
22    microphone down close to your phone, either there or at counsel
23    table or at the lectern, whichever works easiest.  Perhaps you
24    can hold it close to the microphone.  And it may be easier for
25    you to do so at the lectern.  I'll leave it to you,
```

Sheikh Abdullah, MD - Direct Examination

1   Mr. Mayberry, given the unique set of circumstances, how best

2   to proceed.

3           And, Madam Court Reporter, if you struggle at all, if

4   you'll let us know.

5           THE REPORTER:  Yes, sir.

6           MR. MAYBERRY:  I'll go ahead and call him now.

7           THE WITNESS:  Hello.

8           MR. MAYBERRY:  Good morning, Dr. Abdullah.  This is

9   Attorney Jason Mayberry.  We're actually in open court right

10  now.

11          THE WITNESS:  Good morning.  How are you doing?

12          THE COURT:  Dr. Abdullah, this is Judge Tuite.  How

13  are you?

14          THE WITNESS:  I'm well.  Thanks, Judge.  I can barely

15  kind of hear you.

16          THE COURT:  Thank you for taking time out of your

17  morning to speak to us.  We are now going to swear you in.

18          THE WITNESS:  Okay.  Sounds good.

19  WHEREUPON,

20                        **SHEIKH ABDULLAH, MD,**

21  was called as a witness and, after having been first duly

22  sworn, testified as follows via WhatsApp on Mr. Mayberry's

23  smartphone:

24                        **DIRECT EXAMINATION**

25          THE COURTROOM DEPUTY:  Please state your name for the

Sheikh Abdullah, MD - Direct Examination

 1  record.

 2           THE WITNESS:  Sheikh Ahmed Abdullah, MD.

 3           MR. MAYBERRY:  Thank you, Dr. Abdullah.

 4           Your Honor, may I inquire?

 5           THE COURT:  Mr. Mayberry, I think it will be very

 6  important, if not critical, that you keep that phone as close

 7  to the microphone as possible so that the court reporter can

 8  take down what he's saying and we can all hear him.

 9           MR. MAYBERRY:  Sure.  If I may inquire, Your Honor.

10           THE COURT:  You may.

11           THE COURTROOM DEPUTY:  Do you want to call

12  Dr. Johnson?

13           MR. MAYBERRY:  Doctor, I'm sorry.  We're going to

14  call the case manager nurse from the jail so that he can hear

15  the testimony and --

16           THE WITNESS:  Sure.

17           MR. MAYBERRY:  -- ultimately for purposes of

18  determination.

19           MS. RICH:  That phone number is (727) 464-6567.

20           MR. JOHNSON:  Hello?

21           MS. RICH:  Good morning, Mr. Johnson.  This is

22  Candace Rich.  Can you hear me?

23           MR. JOHNSON:  I can hear you just fine.

24           MS. RICH:  We're here in open court here with

25  Judge Tuite as well as Defense Attorney Jason Mayberry and his

Sheikh Abdullah, MD - Direct Examination

1   client Ms. Emrah Kuc.  We're calling you, as we discussed we

2   would last week, regarding taking some testimony from a doctor

3   who's going to speak to what Ms. -- what he believes Ms. Kuc's

4   medical needs are at the jail.

5         MR. JOHNSON:  Okay.

6         MS. RICH:  We're going to have you on the line while

7   Mr. Mayberry asks the doctor some questions so that you can

8   have the benefit of hearing directly from the doctor as to what

9   his opinion is as to Ms. Kuc's current needs.  Okay?

10        MR. JOHNSON:  Yes, ma'am.

11        THE COURT:  Good morning, Mr. Johnson.  This is

12   Judge Tuite.  How are you?

13        MR. JOHNSON:  I'm well, sir.  Thank you.

14        THE COURT:  Mr. Johnson, we're going to swear you in

15   at this time.

16      (Mr. Johnson Is Sworn.)

17        THE COURTROOM DEPUTY:  Thank you.  Can you please

18   state your name for the record.

19        MR. JOHNSON:  My name is Joel Johnson.

20        MR. MAYBERRY:  May I inquire, Your Honor?

21        THE COURT:  You may.  And just for the benefit of

22   counsel, the more I think about it, this can be analogized to a

23   normal court hearing, perhaps the best way to do it, it's as if

24   Mr. Johnson were sitting in the gallery and could hear all the

25   testimony that's elicited.

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

1          Ms. Rich, if you need to confer with Mr. Johnson once

2     the direct examination is done.  You take notes, Mr. Johnson,

3     if you would like to take notes so you can confer efficiently

4     with Ms. Rich before she conducts her cross-examination, I

5     think that would be more of a standard protocol.

6          And, Ms. Rich and Mr. Mayberry, I'll allow some

7     latitude here if there needs to be some fluidity, but I think

8     eliciting a full direct examination and then a full

9     cross-examination, to the extent that we can, is the best

10    approach.

11         With that, Mr. Mayberry, you may proceed.

12         MR. MAYBERRY:  Thank you, Your Honor.

13    BY MR. MAYBERRY:

14    **Q.**   Doctor, just for efficiency, you're here this morning to

15    testify as to what Ms. Emrah Kuc's needs are as a transgender

16    woman post gender -- post gender-transition surgery.  Is that

17    correct?

18    **A.**   That is correct.

19    **Q.**   Okay.  And, Doctor, this may sound like a goofy question,

20    but what is your occupation?

21    **A.**   I'm a plastic surgeon.

22    **Q.**   Okay.  And can you tell the Court exactly what you do

23    specifically as a plastic surgeon over in your normal week, I

24    guess?

25    **A.**   Sure.  I'm -- I've been a plastic surgeon now for 30

Sheikh Abdullah, MD - Direct Examination

1  years, and I do all kinds of plastic surgery.  My practice was

2  in Fargo, North Dakota for 27 years, which I closed down in

3  2019.  At that point, I did mostly cosmetic surgery.  And the

4  only reconstructive surgeries I did -- I rotated were either

5  transgender work or breast reconstruction.  And then since

6  then, I've been doing what's called locum tenens work.  I moved

7  to Florida since then.  And so I do reconstructive surgery in

8  locum tenens work, such as, you know, flaps that are for skin

9  cancer and various -- I do a lot of breast reconstruction.  And

10  my practice in Florida now is part-time, and I do transgender

11  work and I do some cosmetic surgery.

12  **Q.**   Okay.  Let's talk about the transgender work.  Can you

13  explain for the Court what does that mean when you say you do

14  transgender work?

15  **A.**   Well, I [unintelligible] in that I trained in Texas at the

16  University of Texas Medical Branch in Galveston back in the

17  early '90s, late '80s, early '90s, where we had a large

18  transgender practice.  I was trained by one of the primary

19  surgeons that started such work that did one.  And so I got a

20  lot of exposure to doing transgender work, which means both

21  male to female and female to male.

22      But the female to male, I only do upper -- it's called

23  upper surgery and lower surgery.  Upper surgery is breasts, as

24  doing mastectomies from male -- from female to male or the

25  augmentation from male to female.  And then lower work -- the

Sheikh Abdullah, MD - Direct Examination

1  only lower work I've really ever done is male to female

2  transgender work, which is removing the penile and testicular

3  area into a vagina and cervix, the cervical work and the

4  urethroplasty and things like that.  So that is what I've done

5  mostly for -- in transgender work.  I've probably done a few

6  hundred patients.

7  **Q.**   You said you've done a few hundred patients.  Can you

8  clarify what that means?

9  **A.**   That means I've treated and operated upon that many

10  transgenders in my career.

11  **Q.**   Of those couple hundred --

12  **A.**   Couple of hundred, yes.  But a lot more than that -- upper

13  work, I've done a lot more of, of course, because there's a lot

14  more demand for it.  There's not as much demand for final

15  conversion of genital surgery, so...

16  **Q.**   How many procedures -- well, let me ask it -- let me back

17  up a little bit.  Can you kind of walk the Court through what's

18  required for a male-to-female, full gender-transition surgical

19  process from a --

20  **A.**   Okay.  So -- yeah, I'll tell you exactly what I do.  I

21  will see a patient after they have psychiatry and

22  endocrinology.  So they need to have two years of -- about two

23  years of psychiatric evaluation and cross-dressing and then a

24  year of hormone treatment.  That's when I'll see the patient

25  and see what they want to do.  I guess the vast majority of

16

Sheikh Abdullah, MD - Direct Examination

1   them only want upper work done.  So in a male-to-female

2   transition, the area requires breast augmentation, facial and

3   feminization surgery, such as rhinoplasty and mandibular

4   contouring, et cetera, like that.

5        And then lower half requires, basically, I do it all in

6   one operation, but it's really six operations rolled into one.

7   What you do is you do a penile penoplasty, which is you remove

8   parts of the penis, and then you do a vaginoplasty, where you

9   make a neovagina and then a cervix, a clitoroplasty where you

10  take the head of the penis and you make the clitoris out of

11  that, the urethroplasty where the urethra is shortened and made

12  into -- instead of male, made into a shorter female urethra,

13  and then orchiectomy, that's the removing of testicles, and

14  then do a labiaplasty, which makes the labia out of the

15  testicular skin.

16       So that all is done as one.  And that's called lower

17  transgender transformation surgery.

18  **Q.**   And approximately how many lower transgender

19  transformation surgeries, as you've just described, have you

20  performed?

21  **A.**   Over a hundred, maybe even closer to 200, somewhere in

22  there.  We used to do a lot of those in my training.  And then

23  when I went to Fargo, North Dakota, there's nobody else doing

24  it there, and so we actually had a team of two psychiatrists,

25  an endocrinologist, and myself in the whole city, in fact, the

Sheikh Abdullah, MD - Direct Examination

1    whole state, so we used to see a lot of transgenders coming

2    there.

3         And starting the last few years, since insurance companies

4    started paying for it, they didn't used to, the numbers have

5    gone way up.  And I've probably done, you know, three or four a

6    month sometimes.  So it all depends on who can get -- who's,

7    you know, approved to do it.  It's a lot of processes to get

8    from point A to point B.  They have to cross -- you know, cross

9    a lot of Ts and dot a lot of Is before they can get surgery.

10   And now that insurance covers it, a lot more are trying to --

11   trying to get it.  They still have to go through the usual

12   process of psychiatric, endocrinology -- endocrinology,

13   et cetera.

14   **Q.**   Can you briefly --

15   **A.**   Most of them -- most of them are in the top surgery first.

16   **Q.**   Can you briefly go through your educational background for

17   Judge Tuite?

18   **A.**   Sure.  I went to college.  I'm originally from Pakistan.

19   I came to this country in 1977.  Went to college at Haverford

20   College and got my bachelor of science degree in 1981.  And

21   then I went to medical school at Northwestern University in

22   Chicago.  Got my doctorate in 1985.

23        Then I went to the University of Texas Medical Branch and

24   did my general surgery residency, which is five years, got

25   board certified in general surgery, and then did three years of

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

1    training in plastic surgery and got my board certification in

2    plastic surgery in 1993.

3        And since then -- then I went to Fargo and opened my

4    practice.  Since then, I've recertified twice.

5    **Q.**   Okay.  Doctor, so you've obviously performed a number of

6    these surgeries.  Have you been involved with patients in the

7    postoperative recovery and then -- well, let me ask you that.

8    Let me start with that question.  Have you been involved in

9    postoperative recovery with patients who's had a full

10   transgender bottom surgery?

11   **A.**   Absolutely.  Absolutely.  I've taken care of not only my

12   own patients but, you know, patients that are going somewhere

13   else, which I used to do a lot more, because patients used to

14   not be able to afford the surgery in the U.S., so they'd go to

15   Mexico or some other place and get the surgery done.  And then

16   they'd be back in the area, and then I'd follow them.  Then I'd

17   follow them the post-op surgeon, secondary revisions, and

18   dilations, and things like that.  So -- and I follow my

19   patients for a long time, just because these patients do

20   need -- almost all of them need some sort of revisionary, some

21   revisionary surgery.  A they all need secondary education, how

22   to take care themselves afterwards, because this is not like

23   just forming a vagina and then go home.  There needs to be a

24   lot of postoperative care in keeping the skin of the vagina

25   [unintelligible].  This is the most common issue you with

Sheikh Abdullah, MD - Direct Examination

 1  postoperative transgender male-to-female is the vaginal vault

 2  care and treatment.

 3  **Q.**   You said vaginal wall care?

 4  **A.**   Vaginal vault, v-a-u-l-t.  We call it the neovagina.  It's

 5  the vaginal vault.

 6  **Q.**   Vaginal vault.

 7  **A.**   Medical terminology for the vagina, the whole vagina, the

 8  opening and the [unintelligible].

 9  **Q.**   Okay.  And the vaginal vault, it consists of the opening

10  and then I guess the interior cavity.  Is that right?

11  **A.**   That's right.

12  **Q.**   Doctor, can you describe -- and Ms. Kuc is a little over a

13  year postoperative transgender surgery.  Can you describe for

14  the Court what the requirements are for care within the first

15  year of a transgender surgery.  Then I'll ask you the same

16  question for care after post-op.

17  **A.**   Sure.  Well, it's very individualized.  So, you know, and

18  the original doctor -- but, obviously, I've never seen her,

19  I've never examined her, so I'm [unintelligible] doing exactly

20  what she needs.  But I can tell you pretty much, in the first

21  year, the hardest job that the patient has would be to keep the

22  vaginal vault [unintelligible].  Because the scarring that

23  occurs, unfortunately, constricts, especially the opening of

24  the vaginal vault, and that becomes a real problem.  Plus,

25  depends on how the surgery was done.

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

1       The other issue, the second issue is like urinary tract

2   infections.  That depends on the angle of the urethra opening.

3   If the urethra opening is made anteriorly, then infection is

4   not as much a problem as -- sit down and urinate, because the

5   stream doesn't go down, it goes straight forward.  If the

6   vaginal vault -- if the urethra is made too far posteriorly or

7   too far low, then the urine stream is okay, but then it's so

8   close to the vaginal opening and the anal opening that that

9   combination of the urethra opening can be a problem and then

10  they get bladder infections.

11      In her case, not sure what her anatomy looks like, but

12  those areas I'd be very concerned about and how they're taken

13  care of on a daily basis.

14  **Q.**   What about dilation in the first year?  Can you describe

15  to the Court what a typical person's needs are?

16  **A.**   Well, that's the most important here.  The most important

17  time of dilation is simply because that's when most scar

18  contraction occurs.  When you think about it, the neovagina is

19  made from the skin of the penis, which is inverted, sewed

20  together, and then a tunnel is made in the suprapubic -- in the

21  subpubic suprapubic area, and then the penile skin is then

22  buried into that and sutured down under there.

23      And so -- and, of course, there's a suture line that runs

24  all the way around the vaginal opening and a suture line that

25  runs along its -- well, one of its lengths, and then the

Sheikh Abdullah, MD - Direct Examination

1   sutures across the base of it, which is, you know, an abnormal

2   tract in the human anatomy since that tract didn't exist.

3        So, obviously, any time you make a traction that's not in

4   a natural splay, if you may, the scar, in contracting the body,

5   is trying to heal itself, trying to control contraction, close

6   up.

7        The worst-case scenario that happens is that the -- that

8   the vaginal -- the neovaginal tunnel is become shortened

9   because it scars from the inside out, and it contracts the

10  surface in the circular suture line is, and that causes it to

11  become really small.  So that's why in the first year, it's

12  really important -- I usually start my patients at about two or

13  three weeks, start dilating, and I have them get different

14  sized dilators, and I tell them you have to get each dilator in

15  every day, two or three times a day, till they get the biggest

16  possible.  And it's -- sometimes it's easy, sometimes very

17  difficult for patients to do that regularly.

18       And there's a lot of -- there's a lot of psychological

19  stigmas that are involved in this setting without even talking

20  about, you know, family, acceptance, et cetera.  So for them to

21  have the ability to three or four times a day to -- two to four

22  times a day dilate themselves is sometimes very difficult.

23  But, you know, mostly if they're so motivated that they're and

24  then their [unintelligible] so...

25  Q.   What about maintaining proper hygiene or cleansing of the

Sheikh Abdullah, MD - Direct Examination

1   neovagina.  What do you recommend with that?

2   **A.**   I'm sorry.  You cut out -- you cut out at the end of the

3   question.

4   **Q.**   The question I have is, what do you typically recommend in

5   terms of hygiene in making sure that the neovagina is kept

6   clean?

7   **A.**   Well, that's obviously key for any kind of infection or

8   increased scar contraction.  So -- and not just contraction,

9   but colonization of bacteria in that area, obviously, I'm very

10  concerned.  I have my patients wash themselves, you know,

11  sometimes even twice a day initially, and then at least once a

12  day with a hand shower, let the water really get in there and

13  clean up the neovagina, keep the area around -- on the

14  [unintelligible] opening clean.  They grow hair back there.

15  Hair, of course, can be an issue of contamination, holding onto

16  bacteria.  So washing that area [unintelligible] is very

17  important, certainly initially to stabilize the scar

18  contraction which can take up to two years actually.

19  **Q.**   Doctor, you mentioned something called a hand shower.  Is

20  that like a removable showerhead?  Is that what you're

21  referring to?

22  **A.**   Yeah.

23  **Q.**   Okay.

24  **A.**   Yeah, something they can manipulate with one hand and get

25  the water to shoot around, in and out of the vagina.  And as

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

 1  much as you can with that and then a regular shower, obviously,

 2  to that area is different to reach.

 3  **Q.**   In this case, Ms. Kuc is -- her surgical -- original

 4  transgender surgery occurred in 2019, December, right around

 5  December of 2019.  So she is a year postoperative.

 6  **A.**   Just A little bit of a year post-op.  Like I said, the

 7  individual -- individual -- the individual, they should --

 8  depends on how fast -- the scars are supposed to stabilize in

 9  about a year, two years.  Sometimes it goes longer, sometimes

10  less time, depending on the patient's physiologic state.

11  There's just so many variables to it.  So she's about a year,

12  year -- year and two months out.  Her scars are

13  [unintelligible] at this point, depending [inaudible].

14          THE COURT:  Hold on one second.  Mr. Mayberry, you're

15  going to have the doctor repeat everything that he just said in

16  that last answer.  Because in pulling away from the microphone,

17  we lost what the doctor was saying.

18          MR. MAYBERRY:  I'm sorry, Doctor.  Can you please

19  repeat what you just said?

20          THE WITNESS:  Well, the question I asked was she's --

21  I think you told me she can get one finger in.  Is that right?

22  BY MR. MAYBERRY:

23  **Q.**   Roughly, yes.

24  **A.**   Okay.  So that's pretty small for a year and 12 months

25  out.  That means she's in significant contraction already,

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

1  which means that she has to be very aggressive in dilating

2  that.  And she needs a dilator to slowly dilate the area two or

3  three times a day to get that scar to release and reopen up

4  that.  One finger in is clearly a small opening.  The problem

5  she can have with that, of course, is in keeping the area of

6  the neovagina clean.  I think that will be a real problem,

7  because she will probably need regular douching, you know, do

8  those douches that are for women's vaginal cleaning.  She

9  should definitely do that at least once or twice a week to keep

10  the neovagina free of bacteria buildup.  Because about one

11  finger opening means she's got a cavity inside, depending on

12  how the deep the neovagina is, it all depends on how much space

13  there is in -- that's a lot of space for bacteria to

14  accumulate.  So keeping that -- it's not just cleaning.  A hand

15  shower is an essential.  The vaginal opening is small.  She may

16  need regular douching also.

17  **Q.**   Okay.  Doctor, in the time that she has been in jail

18  custody, which was -- which has been over 30 days, how would

19  that affect -- tell the Court how that could affect the

20  neovagina with the inability to dilate during that time?

21  **A.**   Well, 30 days is a long time for -- and if she's already

22  contracted to the state that she says she is, I bet she'll be

23  half a finger -- wait till the next maybe two to three weeks

24  between -- if she does dilate that pretty soon.  Even as --

25  once scars start contracting, it contracts faster as it gets

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

1   smaller.  So a [unintelligible] that's ultimately reached, may

2   take a week to become half an inch, but it may take only a few

3   days to become half that size, just to give you a rough

4   analogy.  So that's the kind of scar we're dealing with.  So

5   for her to be able to dilate aggressively is very important at

6   this point.  This is the way I handle this.  Keep it clean,

7   because keeping it clean is very important, otherwise all the

8   dilating work is not going to help important if she has

9   bacteria buildup [unintelligible] in the neovagina, so...

10  **Q.**   Does the bacteria have any effect on the scarring or --

11  just that question.

12  **A.**   Yes.  The bacteria -- the colonized bacteria don't

13  necessarily cause an infection.  An infection is when the

14  bacteria actually invades the tissue.  The colonization is

15  bacterial buildup outside the tissue.  But that can cause a

16  [unintelligible] response around the scar tissue, enough to

17  cause it to contract faster, because obviously the more

18  bacteria the -- and bacteria load you have, the more secretions

19  you can have of toxins, which then cause inflammation, then

20  causes scar formation even faster.

21      Did you follow me there?

22  **Q.**   Yeah, I did.  Does she need a hygienic or a sanitary

23  environment in order to dilate?

24  **A.**   She doesn't need a sterile environment or anything like

25  that, but she needs a clean environment.  Those dilators have

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

1    to be kept clean, supposed to be washed every day with

2    antibiotic soap or whatever, kept in a clean container.  And

3    then before she dilates, she needs to do hand cleansing,

4    douche, whatever it takes to clean out the neovagina, and use

5    the dilators sequentially.  So to dilate two or three times a

6    day, sounds like at this point, for her to get that opening

7    back to its normal --

8    **Q.**   I'm not sure if you answered this question, because I

9    couldn't really understand what you said.  For a person that is

10   over a year postoperative --

11   **A.**   I'm sorry?

12   **Q.**   The question that I have for you, Doctor, is for a person

13   that is over a year postoperative that hasn't been able to

14   dilate for 30 days or more, generally how many times would you

15   recommend they try to dilate to restore neovaginal girth and

16   depth?

17   **A.**   Well, again, it depends on where they're at.  If somebody

18   is this far out and has a normal opening, then they can

19   dilate -- dilate, you know, once or twice a week, even once a

20   day.  That would be plenty.  But somebody who has already

21   contracted down to one finger depth, one finger width, all she

22   can get is one finger, that tells you that that scar is

23   contracting down pretty fast.  If she had one finger now or she

24   had one finger 30 days ago, I don't know the answer to that

25   question.  So [unintelligible] she had one finger dilation, I

Sheikh Abdullah, MD - Direct Examination

1   mean, that scar is contracting down pretty quickly, and she

2   needs to be very aggressive in dilating that, at least two or

3   three times a day, if not more.

4   **Q.**   Okay.

5   **A.**   Because problem is, at some point, it's going to become

6   dilation won't work because the scar will be contracted too

7   much, and then she'll need revision surgery to reopen that --

8              THE COURT:  If you could pause for a moment,

9   Mr. Mayberry.

10             Madam Court Reporter, did you hear that last portion?

11             THE WITNESS:  Hello?

12             MR. MAYBERRY:  We're pausing, Doctor.  One moment,

13   please.

14             THE REPORTER:  All I heard was surgery to reopen

15   that.

16             THE COURT:  Mr. Mayberry, any time you move that

17   phone -- and I understand it's difficult for you, but any time

18   you move that phone away from the microphone, you risk that we

19   can't hear the doctor at all.

20             MR. MAYBERRY:  I understand.  I understand.  It's a

21   little poor.

22   BY MR. MAYBERRY:

23   **Q.**   Doctor, can you -- I'm sorry.  Can you reanswer the

24   question that I just asked you.  I -- it's hard to keep the

25   phone near the microphone and I moved it, and they were unable

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Direct Examination

1   to get what you said.

2   **A.**   Okay.  The last question -- the last question that I heard

3   was if she's already 30 days without dilation -- hello?

4   **Q.**   Yeah.  I'm here.  I'm listening.

5   **A.**   May I speak.

6   **Q.**   Yes, you can.  Go ahead, Doctor.

7   **A.**   So what I'm saying is, if she is -- if she is without

8   dilation for 30 days and her neovaginal opening is one finger,

9   then that tells me her vagina is contracting pretty quickly.

10  Now, in 30 days, can she get more than one finger in?  I don't

11  know the answer to that.  If she [unintelligible] -- if she was

12  already at a finger 30 days ago, then she's lost a lot of

13  ground in 30 days.  If she gets a finger after 30 days and it

14  was fairly close to normal before that, then she's got a chance

15  of getting this redilated, if she can follow this protocol that

16  I just described earlier, so...

17         MR. MAYBERRY:  Okay.  Can I have one moment, Doctor?

18         Your Honor, can I confer with my client one moment?

19         THE COURT:  Absolutely.  Just indicate to the doctor

20  we're taking a brief moment for you to do that.

21         MR. MAYBERRY:  Doctor, I'm going to take a brief

22  moment to confer with my client.  I'll be right back.  Okay.

23         THE WITNESS:  Sure, sure, sure.

24      (Discussion off the record in the courtroom.)

25         MR. MAYBERRY:  Your Honor, that's all I have on

Sheikh Abdullah, MD - Cross-Examination

1    direct.

2            THE COURT:  Okay.  Can you explain to the doctor that

3    the government is now going to ask questions of him

4    potentially.

5            MR. MAYBERRY:  Dr. Abdullah, Candace Rich is the

6    assistant United States attorney.  She's going to get up now

7    and she may have some questions for you.

8            THE WITNESS:  Sure.

9            THE COURT:  Ms. Rich, any questions?

10           MS. RICH:  Yes.

11                          **CROSS-EXAMINATION**

12   BY MS. RICH:

13   **Q.**    Good morning, Doctor.  Can you hear me?

14   **A.**    Yes, I can.

15   **Q.**    I just have a couple questions.  The information that I

16   have is actually that Ms. Kuc's surgery was in October of 2018,

17   so that would be approximately two years and four months ago

18   rather than approximately one year ago.

19           So for someone that receives that surgery in October of

20   2018, assuming that they followed the post-op protocol for that

21   first year and then did whatever maintenance was necessary for

22   the second year, what type of condition would you expect that

23   vaginal vault and the scarring to be in when you're a little

24   over two years post-op?

25   **A.**    That's a good question, but it depends on -- it's a very

UNITED STATES DISTRICT COURT

Sheikh Abdullah, MD - Cross-Examination

1   individualized answer because it all depends on what their

2   operation was and how it was done and how much dilation they

3   had to do.  If they followed the protocol -- so let's just

4   assume the usual first, which is probably about 50 percent of

5   the patients.  Again, what they'll do is they'll do the once --

6   once or twice a day, or two or three times a day sometimes

7   dilation for the first year, and their vaginal opening stays

8   [unintelligible] and their vaginal depth stays uniform, then

9   they can go to a couple times a week and then do that for the

10  rest of their lives.  Basically -- basically, there's no time

11  you cannot do this.

12       That's one thing I explain to my patients early is that

13  this is a lifelong thing.  I can build out, but you've got to

14  maintain it, and the maintaining part is pretty rigorous for --

15  because that area is so active all the time that that scar

16  matures and does fairly well 50 percent of the time where it

17  will stay open.  It will still contract over time if you don't

18  do anything with it.  The dilation and the lifelong dilation is

19  very important for scar tissue in that area.  So they'll have

20  to keep doing that regularly.

21       Now, if during that time, say, a year or three years later

22  or two years later, they start -- for some reason they get an

23  infection, a yeast infection or whatever down there and the

24  scar starts to contract again, and they got to go back to the

25  initial protocol and start being more aggressive in dilating

Sheikh Abdullah, MD - Cross-Examination

1  it.

2        So the time issue is very -- it's not so much a time

3  issue.  The timing -- like I said, scar weakens it, and the

4  average takes a year for scarring to show up or three years or

5  whatever.  The scar doesn't read the book, so everybody is

6  going to heal a little differently.  So it really depends on

7  the clinical evaluation at that point in time for each patient

8  to say where they're going to be at.  At three years, your

9  chance of -- at two years or one to two years have passed and

10  you haven't done dilation regularly and it's contracted down to

11  a point where you can't even function even, then that is the

12  worst-case scenario.  You have to have a reoperation and

13  reformation of the neovaginal opening.  So that's kind of the

14  best I answer I can give you to that question.

15  **Q.**   Thank you, Doctor.  You also have said several times that

16  what's required of a patient post-op is a very individualized

17  situation and it's unique to every patient.  Is that right?

18  **A.**   To some extent, yes.  Like I said, everybody is going to

19  be a little different as far as how they're going to scar over

20  time.

21  **Q.**   So in order to know exactly what would be most appropriate

22  for Ms. Kuc at this point, would you recommend that she be

23  evaluated by a doctor to determine what her specific medical

24  needs would be at this point to maintain the vaginal opening?

25  **A.**   Absolutely.  I think she needs to see a -- you know,

Sheikh Abdullah, MD - Cross-Examination

1   somebody who knows what they're looking at.  I think an

2   evaluation by some physician who's never seen one of these, not

3   really treated one of these is not -- probably not be the

4   appropriate evaluation.  I think somebody -- somebody who can

5   look at it and say, yep, this scar feels -- feels too tight or

6   feels like it's elastic enough that it can be redilated without

7   surgery.  And so, yes, I think she needs an evaluation for

8   sure.

9          MS. RICH:  Okay.  Thank you, Doctor.  I don't have

10  any other questions for you.

11         THE COURT:  Ms. Rich, Mr. Mayberry, any further

12  questions?

13         MR. MAYBERRY:  No, Your Honor.

14         THE COURT:  Let me ask if I could, a question of the

15  doctor.  Doctor, can you hear me?

16         MR. MAYBERRY:  Dr. Abdullah, can you hear

17  Judge Tuite?

18         THE WITNESS:  I can barely hear him.

19         THE COURT:  Mr. Mayberry, if you could ask him this

20  question then.  What's involved in redoing the surgery?

21         MR. MAYBERRY:  Dr. Abdullah, Judge Tuite asked --

22         THE WITNESS:  Yes, I heard that.  I heard that.

23  What's involved in the redoing the surgery would be depending

24  on where the scar is.  If the scar circumvents around, I have

25  to do multiple Z-plasties to open the tissue.  May need a skin

Sheikh Abdullah, MD - Cross-Examination

1    graft to reline the vaginal vault.  It all depends on the scar

2    tissue, how elastic it is, how it's -- how it's gone down,

3    which from -- so it can be fairly extensive surgery, taking

4    about two hours to do, and depending if it needs a skin graft

5    or not.

6           And, again, I don't have -- I can't -- I've not

7    examined her, so I can't tell you exactly what she will need

8    done, because I have to examine the vaginal -- neovaginal vault

9    to give you the answer, specific answer.  But that's what --

10   that's the kind of surgery that's required.  It's called

11   revision.

12          THE COURT:  What are the best-case and worst-case

13   scenarios as to how involved that surgery is?

14          THE WITNESS:  Well, the best-case scenario would be

15   if the -- if the [unintelligible] scar has formed

16   [unintelligible], but it's elastic and can be easily pulled

17   back, then I would probably do a couple of Z-plasties and

18   reopen it and kind of make it normal sized again.

19          The worst-case scenario if it contracts faster, it's

20   really hard and elastic scars, in that case, the whole thing

21   would have to be cut out and then have to see how deep the

22   vaginal vault is, because then she may need a certain amount of

23   skin graft and the [unintelligible] a large space between the

24   inner and the edge of the vaginal lining and the outer skin.

25   So that would take, you know, whatever it takes to cover that,

Sheikh Abdullah, MD - Cross-Examination

1    which would take some --

2              THE COURT:  Can the surgery be --

3              THE WITNESS:  [Unintelligible].

4              THE COURT:  Can the surgery be redone, Doctor?

5              THE WITNESS:  I missed that.  I couldn't hear that.

6              THE COURT:  If you can ask him, Mr. Mayberry.

7              MR. MAYBERRY:  Doctor, Judge Tuite asked can the

8    surgery be redone?

9              THE WITNESS:  The surgery -- the original surgery can

10   be revised.  There's no surgery with the scar tissue -- the

11   scar tissue and the amount of tissue that came with the penile

12   skin that was left, so we removed that, and now you have to

13   replace that with something else, and that's -- that's a big

14   question mark for me.  But that surgery cannot be redone,

15   because -- it's a one-way street -- one-way street, so to

16   speak.

17             THE COURT:  I'm sorry.  I couldn't understand the

18   doctor's answer.

19             MR. MAYBERRY:  Doctor, can you please repeat your

20   answer, but maybe speak more slowly and a little bit louder?

21             THE WITNESS:  Okay.  So the question is, can that

22   surgery be redone, the original surgery?  The original surgery

23   cannot be redone, because it was done with tissues that were

24   there at that time.  And the vaginal vault was created by the

25   inverted penile skin.  That's the standard procedure for

Sheikh Abdullah, MD - Cross-Examination

1   creating a neovagina.  Again, one thing I do not know is was

2   this a standard operation that was done, or was it done in some

3   other way, like using piece of colon and things like that,

4   which makes -- puts a whole different spin on things.  But

5   that's very rare, so won't go -- we'll try not to address that.

6          So let's assume this was a standard surgery that was

7   done with the penile skin was inverted into a space that was

8   created to place the neovagina in.  If that was the case, then

9   that suture lining on the opening of the neovagina will scar

10  down on tissue that was there before.  So that's actually cut

11  out to open it up.  Then you lose tissue.  So you have to

12  replace that with something from the external skin down to the

13  depth of the vaginal lining, wherever the scar would be

14  extended.  So that would be pretty extensive, so future

15  placement.  And so that would be the worst-case scenario.

16          THE COURT:  And the best-case scenario, how does that

17  differ from the worst-case scenario?

18          THE WITNESS:  The best-case scenario that right now

19  she's got a finger, a finger penetration ability.  She gets --

20  she gets the right dilators, she starts dilating them and to

21  the point where the -- and the scar is elastic enough that it

22  stretches, and after, you know, a few months, it may -- maybe

23  [unintelligible] the dilator of her vaginal opening.  In that

24  case, since it's easier to keep it clean, and then she needs to

25  keep dilating it regularly.  That's the best-case scenario

Sheikh Abdullah, MD - Cross-Examination

1  right now would be if she can get away with it nonsurgically.

2          The middle scenario would be if she needs an

3  operation, the scar is elastic enough that when you cut it, you

4  don't have to take away a lot of the other tissue.  You can do

5  things like flaps, like shall Z-plasties to stand to the scar

6  line and therefore open up the opening some more.  But

7  that's -- that's pretty rare.

8          THE COURT:  Okay.  Thank you, Mr. Mayberry.

9          Ms. Rich, anything further from the government?

10          MS. RICH:  No, Your Honor.

11          THE COURT:  Thank you.  Mr. Mayberry, anything

12  further for the doctor?

13          MR. MAYBERRY:  Nothing further for the doctor.

14          THE COURT:  Ms. Rich, do you wish to speak with

15  Mr. Johnson before you give up the opportunity, I suppose, to

16  speak with Dr. Abdullah further?

17          MS. RICH:  No.  I don't need to speak with

18  Mr. Johnson before I question him.

19          THE COURT:  Okay.  Thank you, Mr. Mayberry.

20          I think -- Dr. Abdullah, thank you again for taking

21  time out to speak with us this morning.

22          THE WITNESS:  Thank you, sir.

23          MR. MAYBERRY:  Thank you, Dr. Abdullah.  I'm going to

24  hang up now.

25          THE COURT:  Mr. Mayberry, before we go to

Joel Johnson - Direct Examination

1    Mr. Johnson, any further evidence, testimony?

2             MR. MAYBERRY:  No, Your Honor.

3             THE COURT:  Do you rest?

4             MR. MAYBERRY:  We do.

5             THE COURT:  Okay.  Ms. Rich.

6             MS. RICH:  Thank you.

7    WHEREUPON,

8                          **JOEL JOHNSON,**

9    was called as a witness and, after having been first duly

10   sworn, testified as follows via telephone:

11                       **DIRECT EXAMINATION**

12   BY MS. RICH:

13   **Q.**   Mr. Johnson, this is Candace Rich.  Are you still on the

14   line?

15   **A.**   I am.

16   **Q.**   Were you able to hear all of the testimony from the doctor

17   that was just proffered by the defense?

18   **A.**   Yes, I heard.

19   **Q.**   Okay.  I want to start with a simple question.  Has

20   Ms. Kuc been medically evaluated by anyone at the jail?

21   **A.**   She saw one of our nurse practitioners, but she was not

22   able to examine her vaginal area directly.

23   **Q.**   Why not?

24   **A.**   The patient did not want to be examined.

25   **Q.**   So Ms. Kuc refused the medical examination of her vaginal

Joel Johnson - Direct Examination

1   area?

2   **A.**   That's correct.

3   **Q.**   If -- would you recommend -- for purposes of getting a

4   full picture of what Ms. Kuc's current medical needs are, would

5   you recommend that she be first evaluated by someone at the

6   jail?

7   **A.**   Oh, absolutely.

8   **Q.**   And if --

9   **A.**   -- I mean, looking at all --

10  **Q.**   If --

11          THE COURT:  I'm sorry.  Mr. Johnson, if you could

12  wait until Ms. Rich finishes asking her question before you

13  answer, and, Ms. Rich, if you would wait until Mr. Johnson, to

14  the best you can discern, finishes answering your question.

15          Mr. Johnson, it's difficult to hear a witness

16  testifying over the phone.  We're doing the best we can.  But

17  we're also taking down everything you say stenographically.

18  And to do that, you'll have to give enough time between the

19  question and answer, and then speak loudly, slowly, and

20  distinctly.

21          Do you understand?

22          THE WITNESS:  Yes, Your Honor, I do.

23          THE COURT:  Thank you.

24  BY MS. RICH:

25  **Q.**   Mr. Johnson, if after that examination was conducted, it

UNITED STATES DISTRICT COURT

Joel Johnson - Direct Examination

1    was recommended by the jail that Ms. Kuc be seen by a

2    specialist outside the jail to assess her medical needs, would

3    the jail accommodate that recommendation?

4    **A.**    Yes, we would.

5    **Q.**    If Ms. Kuc requested to be seen by a specialist outside

6    the jail to address her specific medical needs, would the jail

7    accommodate that request?

8    **A.**    Most likely.

9    **Q.**    Now, with respect to the dilation, is it your

10   understanding that there's a specific dilator or medical device

11   that's necessary in order to perform the dilation?

12   **A.**    Yes.

13   **Q.**    And since Ms. Kuc has been at the jail, has there been

14   ongoing discussion regarding her ability to use the dilator?

15   **A.**    There has.  I spoke to our medical director, and the plan

16   for her is to bring her to one of our medical clinics and

17   afford her a place to clean her hands and use her devices,

18   which would then be cleaned and stored until she needed them

19   again.

20   **Q.**    And when you say "her devices," is it your understanding

21   that Ms. Kuc would have her own personal dilator devices

22   brought to the jail for her to use or would the jail provide

23   the dilators?

24   **A.**    We actually were in the process of ordering them because

25   hers weren't brought in.  But over the weekend, one of her

UNITED STATES DISTRICT COURT

Joel Johnson - Direct Examination

1    family members must have brought them in.

2    **Q.**   Okay.  So prior to this past weekend, no one had brought

3    any dilators to the jail for Ms. Kuc to utilize?

4    **A.**   That's correct.  I spoke to her older sister, probably 12

5    days ago, and she had agreed to bring them in.  So we sort of

6    held off ordering them until Thursday, and --

7    **Q.**   So why did you ultimately order them on Thursday?

8    **A.**   Because so much time had elapsed from the time that we

9    learned that she needed them and we hadn't received her

10   personal ones.

11   **Q.**   So the inability of Ms. Kuc to properly dilate for the

12   past several days, that's been simply because the jail has been

13   waiting for her family to bring her dilation device in?

14   **A.**   That is true.

15   **Q.**   During that time, did you offer her the opportunity to use

16   one of the dilators that's provided by the jail?

17   **A.**   No.  We -- we waited until Thursday and started looking to

18   order one.

19   **Q.**   Was Ms. Kuc ever told that she would not be allowed to

20   dilate as necessary to maintain her vaginal opening?

21   **A.**   I think the first nurse that she saw here at a sick call

22   didn't know that that was a procedure that we handle.  So it's

23   possible she was told yes -- or that she would not be allowed,

24   but then since then, she saw a nurse practitioner who told her

25   that we would absolutely be able to accommodate her needs.

Joel Johnson - Direct Examination

1  **Q.**   Has the jail had other inmates who required this
2  specific -- these specific medical needs?
3  **A.**   Yes.   I know of one other case since I've been here.
4  **Q.**   And were those inmate's needs able to be met inside the
5  jail?
6  **A.**   They were.
7  **Q.**   Now, turning to the needs that were specifically addressed
8  by the doctor in his testimony, I believe he said that,
9  assuming that Ms. Kuc has a one-finger opening, she would need
10 to have regular douching, one to two times a week.   Is that
11 something the jail can provide?
12 **A.**   Of course.
13 **Q.**   He also recommended that Ms. Kuc be able to dilate two to
14 three times a day in what he described in a clean environment.
15 Is that something the jail can accommodate?
16 **A.**   Yes.
17 **Q.**   I believe he also discussed using an antibiotic soap to
18 clean the dilator before and after each use.   Is that something
19 the jail can accommodate?
20 **A.**   Of course.
21 **Q.**   He also said that Ms. Kuc would need to wash the vaginal
22 area prior to the dilation.   Is that something the jail can
23 accommodate?
24 **A.**   Yeah.   I assume they would give her a chance to take a
25 shower before the procedure.   They -- they would probably have

UNITED STATES DISTRICT COURT

Joel Johnson - Direct Examination

1    to work out some sort of schedule where she would know when she

2    needed to shower and, you know, when the dilation was going to

3    be scheduled.

4    **Q.**   So with some planning, the jail can accommodate that as

5    well?

6    **A.**   Yes, of course.

7    **Q.**   And with respect to a hand shower, as it was described by

8    the doctor, is the jail able to provide the proper cleaning

9    that's necessary before, during, and after the dilation

10   process?

11   **A.**   No.  We don't have any hand showers.  It would be just a

12   regular shower.

13   **Q.**   Okay.  There would be soap provided and the antibiotic

14   soap for the dilator, though?

15   **A.**   Oh, yes, yes.  The dilators would have to be cleaned per

16   the manufacturer's recommendation.

17   **Q.**   Since you had the benefit of listening to the doctor

18   testify, were there any -- did you hear any recommendations by

19   the doctor with respect to Ms. Kuc's medical care that you

20   flagged as something that the jail actually cannot provide for

21   Ms. Kuc at this time?

22   **A.**   Pretty much just the hand shower.  That's one thing we

23   have no facility to provide that, but everything else I think

24   can be worked out.  If she's examined by our doctor, then it's

25   determined she needs to see an outside doctor, that can be

UNITED STATES DISTRICT COURT

Joel Johnson - Cross-Examination

1  handled.  We have exam rooms.  It's just like a normal doctor's

2  office room that she could be placed in and given the chance to

3  cleanse her hands and everything.  Nursing staff would maintain

4  her dilators and see that they're washed before and after use.

5  I don't see anything that the doctor said that we wouldn't be

6  able to manage.

7           MS. RICH:  Thank you, Your Honor.  I'll pass the

8  witness.

9           THE COURT:  Thank you.

10          Mr. Mayberry, any cross-examination?

11          MR. MAYBERRY:  Briefly, Your Honor.

12                         **CROSS-EXAMINATION**

13  BY MR. MAYBERRY:

14  **Q.**  Good morning, Mr. Johnson.  How are you?

15  **A.**  I'm well.  Thank you.

16  **Q.**  Mr. Johnson, you heard testimony from a doctor, you

17  were -- or you heard what he had to say.  Is that right?

18  **A.**  I did indeed.

19  **Q.**  Okay.  Did you hear him say that it was in his opinion

20  that her evaluation would need to be performed by someone with

21  experience with gender-transition surgery.

22  **A.**  I did hear that.  I think -- I think that's probably a

23  good idea.  I think our doctors here would agree to that.

24  Obviously, I think she should be examined here first and

25  determine if there is a very serious issue that's happening

Joel Johnson - Cross-Examination

1   right now so that we know how quickly she needs to get out to

2   see somebody.

3   **Q.**   The doctors that would be examining her in the jail, do

4   you have any idea how much experience they have personally with

5   transgender surgery?

6   **A.**   I would expect probably very little experience.

7   **Q.**   Okay.  It's true that they would be the ones that would

8   make the decision on whether or not she could get out to see a

9   specialist after their evaluation?

10  **A.**   Yes.  They would have to order that, and they -- I'm sure

11  that they would take into consideration Ms. Kuc's thoughts on

12  the matter.  But, ultimately, it would be our providers here

13  that would have to order that, that is correct.

14  **Q.**   You would agree with me, Mr. Johnson, that a doctor that's

15  inexperienced with transgender surgery would be making the

16  determination on whether or not she could see a specialist,

17  though.  Correct?

18  **A.**   That's correct.  But I think it -- they are at least able

19  to examine the opening and decide whether or not if there's any

20  infection happening.  That's something that is universal, and

21  any physician would be able to determine if that was happening.

22  Also, the depth, the width, the opening, the girth, that would

23  be readily identifiable.

24  **Q.**   But at the end of the day, she's being evaluated by your

25  doctors who don't, on a regular basis, deal with transgender

Joel Johnson - Cross-Examination

1  neovaginal patients?

2  **A.**    That's correct.

3  **Q.**    Okay.  And we spoke, along with Ms. Rich, on April 1st,

4  2021.  Do you remember that conversation?

5  **A.**    I do.

6  **Q.**    Okay.  Is that date correct, April 1st, 2021, last

7  Thursday?

8  **A.**    Yes, sir, that's correct.

9  **Q.**    Are you aware that her dilators were delivered on that

10  day?

11  **A.**    I was not aware of that.  It must have been after I had

12  gone home for the day.  For some reason, staff decided to put

13  them in my office instead of get her going on her schedule.

14  **Q.**    Okay.  And she hasn't been afforded the ability to dilate

15  since that time.  Is that right?

16            THE COURT:  Bless you.

17            THE WITNESS:  That is correct.  We have to set that

18  up today.

19  BY MR. MAYBERRY:

20  **Q.**    Clarification question, did you say that the jail has

21  dilators there available for her use?

22  **A.**    We ordered -- we ordered them on Thursday, so I doubt that

23  they've arrived, given that Friday was a holiday.

24  **Q.**    You mentioned there was one other case of a transgender

25  inmate at the jail.  Do you recall when that was?

Joel Johnson - Cross-Examination

1   **A.**   Not exactly.  It's been several years.

2   **Q.**   Do you know if the same medical doctors that would be

3   making the decision on whether or not Ms. Kuc sees a specialist

4   were the ones that cared for that individual?

5   **A.**   She would be primarily cared for by the nurse practitioner

6   that handles the building that she's in.  Primarily that

7   practitioner that would be seeing her, and she's a female.

8   But, ultimately, the call to send her out would belong to our

9   director.  I believe he was here during that other patient's

10  stay.

11  **Q.**   Were you aware that when she saw the nurse practitioner

12  initially, that she was told that that nurse practitioner

13  wasn't particularly experienced with neovaginas and that she

14  could wait to be seen until after a blood draw?

15  **A.**   I was not aware of that.  But she -- we tried to get blood

16  from her.  There was a bit of delay.  She refused several times

17  before she finally did acquiesce.

18  **Q.**   She has given blood?

19  **A.**   She has, yes.  And her medications, her hormone therapies

20  have been started, despite the fact that we don't have any

21  records yet of a pharmacy where she had recently gotten those

22  medications.

23         MR. MAYBERRY:  May I have one moment to confer with

24  my client, Your Honor?

25         THE COURT:  Yes, sir.

UNITED STATES DISTRICT COURT

Joel Johnson - Cross-Examination

1        (Discussion off the record in the courtroom.)

2              MR. MAYBERRY:  We have nothing further.  Thank you.

3              THE COURT:  Any redirect, Ms. Rich?

4              MS. RICH:  No, Your Honor.

5              THE COURT:  Thank you.

6              Mr. Johnson, how quickly can your physician or other

7    provider examine the defendant here to ascertain whether she

8    needs to see a specialist?

9              THE WITNESS:  Your Honor, I would expect they would

10   agree to see her today.

11             THE COURT:  Okay.  And then how quickly, if they were

12   to write for it, would she be seen by a specialist?

13             THE WITNESS:  That question is a little harder to

14   answer.  For obvious reasons, there probably aren't that many

15   specialists in the area, and we would have to find one that

16   would be willing to see an inmate, so it could be a bit of a

17   challenge.  I expect within a week or so they'd have an answer.

18             But we would start the dilation now if she's able to

19   start, I'm sure.  We have the dilators now.  We have the

20   facility to allow her to do it.  So I would expect she would

21   start that today.

22             THE COURT:  Okay.  Thank you, Mr. Johnson.

23             THE WITNESS:  You're welcome, Your Honor.

24             THE COURT:  Hearing nothing further from either side

25   Mr. Johnson, we appreciate you again taking time out of your

48
Joel Johnson - Cross-Examination

1   day to speak with us.

2          THE WITNESS:  Yes, sir.

3          THE COURT:  Thank you.  We're going to hang up now,

4   Mr. Johnson.

5          THE WITNESS:  Yes, sir.  Thank you, Your Honor.

6          THE COURT:  Thank you.

7          Mr. Mayberry, any argument you wish to make?

8          MR. MAYBERRY:  If I may, Your Honor.  Would you

9   prefer I stay here or go to the lectern?

10         THE COURT:  Whichever is easier for you.

11  Particularly with the stenographer, it's a little easier to

12  hear counsel at the lectern.

13         MR. MAYBERRY:  Sure.  Your Honor, I guess I'll limit

14  my argument for the medical now and then address other things,

15  if you want me to move into that, or do you want me to address

16  3142 factors in addition to the medical, or how do you prefer

17  that I --

18         THE COURT:  Let me just, as a housekeeping matter, go

19  back to a discussion that I believe we had last time on the

20  record.  The statute, the Bail Reform Act, limits the ability

21  of a party to reopen a detention hearing unless certain

22  conditions are met.  It's my recollection, Mr. Mayberry, that

23  when we last spoke about reopening this hearing, that the

24  grounds for reopening the hearing were limited to that aspect

25  of your motion that dealt with the care at the jail.  Did I

                    UNITED STATES DISTRICT COURT

1   misrecollect that?

2       MR. MAYBERRY:  That was the base -- Your Honor, I

3   think from my argument to address what Your Honor just

4   mentioned in terms of clearing that hurdle, that was my basis

5   for that.  And the way that I've analyzed the statute is that I

6   have to meet that standard in order to move into any other

7   considerations under 3142(a) with respect to flight or danger.

8       And so hence my argument, I guess, with the medical,

9   and I can go ahead and get into the medical argument, Your

10  Honor, if you're ready for that.  I want to make sure I'm

11  addressing every concern you have before getting into -- I

12  don't want to --

13      THE COURT:  Let me just go back to what I said.  I

14  thought you had agreed that the basis for reopening the hearing

15  was the medical care that your client was getting in the

16  Pinellas County Jail and that is the basis for reopening and

17  the basis for seeking her release.

18      MR. MAYBERRY:  Yes.  We're saying this same thing, I

19  think, Your Honor.  That is correct.  And so, Your Honor,

20  considering what her needs are as a transgender, I understand

21  what Mr. Johnson says in terms of what they can do and what

22  they will do.  At the end of the -- at the end of the day, in

23  light of Dr. Abdullah's testimony, her gatekeeper in getting to

24  a specialist, and this is what Joel Johnson just said, is going

25  to be kept by the medical doctor within the jail.  Dr. Abdullah

opined that she needs to see somebody with some specialization

in this, because of what the unique needs are for someone that

is transgender has undergone the male-to-female bottom surgery.

Part of my issue is if her gatekeeper to get her care

is a medical doctor who doesn't have experience with this

surgery and he says and goes in and says, "Okay, well, no, I

don't think so," she's subjected to irreversible potential

damage, can't come back from it.  She could go in and she could

have further procedures.  That's going to be wholly dependent

upon what her scar tissue makeup is, whether there's, you know,

any pliability with it, if it's going to be a situation where

there has to be a new grafting, if there's going to be a

situation where they have to completely rebuild the neovagina

or if they can use what's there to rebuild it.  She needs a

specialist per the testimony from Dr. Abdullah.

The -- she's essentially going to have to clear a

hurdle to get to a specialist in spite of what Dr. Abdullah

opined.  So if she has to go to the MD in the jail and they say

no or they say we don't think you need to do it yet, the result

is, you know, potentially irreversible damage to herself.

My experience has been with the jail and my clients,

I -- this is one man's opinion, but I -- but for the U.S.

Marshals Service and the good things that they do for my

clients and everybody else's, it's hard to get the jail to step

up and really get it moving to do things.  That has been my

1  experience.

2          I understand there's issues on the dilators not

3  getting there, scheduling, things like that.  They've been in

4  there since Thursday, and she hasn't been offered an

5  opportunity to use them.  So that is indicative to me that this

6  is not something that -- I just don't have a whole lot of faith

7  that they're going to do what needs to be done for my client's

8  medical needs.

9          One major issue is her being able to be hygienic and

10 cleanse herself with something as simple as what Dr. Abdullah

11 call a hand shower or removable showerhead.  They can't get

12 that in there for her.  If she can't use that, she can't

13 cleanse within herself.  That is something that Dr. Abdullah

14 opined is necessary as well.

15         At the end of the day, Your Honor, it's -- these are

16 situations -- this is something that has come to pass that I --

17 you know, what the jail's ability to care for her was not known

18 to the Court at that point.  It's something that is known now.

19 We do have testimony from a doctor who has done over 200 of

20 these procedures.  I don't feel that Dr. Abdullah was coming

21 in -- you know, we did not pay Dr. Abdullah to be here.  He

22 came here -- he testified.  He didn't charge us a dime.  And I

23 think he just gave an honest opinion of what he could possibly

24 extrapolate from the scenario that we have.

25         In light of that, you know, we believe we've cleared

1   that hurdle of offering information to the Court that wasn't

2   known at the time or couldn't have been known at the time as to

3   what the medical need was or where she -- what -- what she's

4   going to require moving forward.  And in light of that, I would

5   ask that Your Honor consider a bond.

6           I can move into the rest of my bond argument if Your

7   Honor, you know, agrees that I've cleared the hurdle.  If I

8   haven't, obviously, it may be moot.  But I do believe based on

9   the testimony here today, the jail is going to -- they -- you

10  know, they can do some things, but just meeting the, you know,

11  we-can-do-this or we-can-do-that standard is not -- not what

12  she needs.  She ought to be able to be afforded medical care

13  that is in accordance with what she would get if she were

14  outside.  You know, this is a situation where she has needs

15  that may be over and above what the rest of us need, but

16  nonetheless if the jail can't accommodate it, I think it's a

17  thing that needs to be considered for Your Honor with a 3142(a)

18  review.

19          THE COURT:  Let me ask a couple questions if I could.

20  First of all, do you have a specialist locally who your client

21  would see?

22          MR. MAYBERRY:  Dr. Abdullah would see her.  He said

23  as much.

24          THE COURT:  Would Dr. Abdullah be willing to see her

25  if the jail were to authorize it?

UNITED STATES DISTRICT COURT

1          MR. MAYBERRY:  I can ask him.  I know he would see

2     her if she were out.  I know that for a fact.

3          THE COURT:  Is there a reason why he wouldn't see her

4     if she were an inmate?

5          MR. MAYBERRY:  I don't think so.  I just haven't

6     addressed the question with him.

7          THE COURT:  And then with respect to Dr. Abdullah's

8     testimony, I heard a number of things that the doctor

9     articulated as to what your client would need.  And I was

10    taking notes, but I'd have to review the testimony to be sure.

11    It appears in Ms. Rich's questioning of Mr. Johnson that she

12    covered most, if not all of those.  And that the only one of

13    roughly half a dozen that she discussed with Mr. Johnson, that

14    they were not, that is, the jail was not in a position to

15    accommodate is the hand shower.

16         Do you recall testimony from Dr. Abdullah that,

17    absent the hand shower as opposed to some other type of

18    showering and cleansing, that the hand shower was of such a

19    critical nature, that without it the other steps that were

20    articulated that could be provided here would be inadequate?

21         MR. MAYBERRY:  Your Honor, I believe he testified

22    that it could cause bacteria -- it could cause bacterial

23    buildup which would then influence scar tissue producing at a

24    more rapid pace.  He did testify as to if it's improperly

25    cleansed, that there will be the potential for bacteria, which

UNITED STATES DISTRICT COURT

1   is going to have a -- I can't remember exactly what he said,

2   but he did opine that it's necessary for proper cleansing.  And

3   I asked him -- I asked him a question about scar tissue

4   buildup, and I believe his response was, yes, that it could

5   influence the scar tissue buildup, if my memory serves.

6           THE COURT:  Is there something about the care at the

7   jail that would not detect that, if that were occurring, or if

8   there's a reason to think that the jail or if there was a

9   specialist like Mr. Abdullah, who would see her potentially

10  with some regularity, that that wouldn't be detected.

11          MR. MAYBERRY:  Assuming that the jail doctor is

12  qualified to know what he's looking at or qualified to -- or is

13  willing to give her the green light on seeing a specialist.

14  Again, I think it comes back to the question, Your Honor,

15  they're going to be serving as a gatekeeper.  There are

16  qualified doctors in the jail --

17          THE COURT:  Let me just go back.  If I could just --

18  I understand that argument.  But I heard Dr. Abdullah

19  articulate a number of things that a patient would need.  All

20  but one of them, it appeared, that Mr. Johnson said they'd they

21  could accommodate.  I'd have to listen to the testimony or

22  examine and review it to be sure.  There's no gatekeeper

23  function there.

24          I didn't hear Dr. Abdullah articulate anything beyond

25  that that she would need at this juncture, and perhaps that

                        UNITED STATES DISTRICT COURT

1   would be further informed by an examination, but the universe

2   of things, perhaps, stated differently, that Dr. Abdullah

3   articulated appear to be things that the jail could accommodate

4   outside of the hand shower.

5          MR. MAYBERRY:  I think the jail can accommodate most

6   of the things if they will.  I think the hand shower is very

7   important, because I think with -- and I'm not trying to -- I'm

8   not trying to beat a dead horse with this, Your Honor, but I'm

9   trying to go through it methodically.

10          Dr. Abdullah recommends that a hand shower be used in

11   order to maintain proper hygiene within the interior of the

12   neovaginal vault.  If that isn't done and a bacteria builds up,

13   it can cause other problems.  So if she goes -- if she's having

14   those issue, then she goes to medical staff who, Mr. Johnson

15   testified, they're not well versed with this particular need,

16   if they misidentify or if they don't have the appropriate tools

17   in their toolbox, for lack of a better term, they're the

18   gatekeepers in terms of deciding whether or not she sees a

19   specialist and moves to the next level with what her care is.

20          And so the detriment that she would endure is if

21   they -- if she has this happening and she goes to them and they

22   say, "Nope, we think it's good, everything is fine," and this

23   continues to advance, it could potentially be irreversible.

24   What I don't know and what Dr. Abdullah would not be able to

25   know or any doctor, for that matter, is if it is irreversible,

1    then what's the next step?

2           THE COURT:  I guess the question I have is, what's

3    the difference between inside the jail and outside the jail?

4    Presumably the only difference would be that your client would

5    be seen by Dr. Abdullah with some regularity on the outside.

6           MR. MAYBERRY:  She could probably care for herself on

7    the outside with respect to the hand shower.  She could do all

8    the things that she would need to do, and then if she needed to

9    get care, she could go to who she wanted to go to without

10   having to clear the hurdle of another medical doctor

11   determining whether she has the ability or liberty to go and do

12   that.  That's my concern, a huge concern.

13          THE COURT:  Thank you, Mr. Mayberry.

14          Ms. Rich?

15          MS. RICH:  I don't have a whole lot to add outside of

16   what was testified to by the defense's doctor.

17          THE COURT:  If you wouldn't mind, Ms. Rich, just the

18   same point --

19          MS. RICH:  I apologize.

20          THE COURT:  -- it's easier to hear you, particularly

21   with the court reporter, at the lectern.

22          MS. RICH:  I apologize.  I don't have a lot to add

23   outside of what the defense's doctor testified to and what

24   Mr. Johnson testified to.  I think probably the best course of

25   action would be to have the jail evaluate her today, as

1    Mr. Johnson said could most likely be accommodated.   They did
2    say that they would take into account Ms. Kuc's thoughts on the
3    issue.   He's already testified that they're providing
4    medication to her that they don't even have a prescription for.
5    They're doing it based on her representation that she needs it.
6    So, clearly, the jail is taking into consideration what
7    Ms. Kuc's feelings are on her medical needs.

8            So my recommendation would be to have her evaluated
9    by the jail, and then the fact that there's a specialist that's
10   lined up and willing to treat her, have her evaluated by a
11   specialist.   If there's follow-up treatment that requires
12   continuing seeing a specialist, I've certainly had defendants
13   that have had to go out for treatment while they've been
14   incarcerated for various medical issues.   It's not unheard of
15   to have an inmate do that.

16           But with respect to the daily needs of Ms. Kuc, I
17   went through each of those, as Dr. Abdullah laid out, and
18   Mr. Johnson's answer to all of those questions, with the
19   exception of the hand shower, was that the jail had the ability
20   to provide those accommodations for Ms. Kuc.

21           The jail does not have a hand shower, but Mr. Johnson
22   said they do have the ability to provide her a sanitary
23   environment where she can properly cleanse herself before,
24   during, and after the dilation to include the biweekly
25   douching, which would certainly cleanse the area very well when

1    that's taking place.

2            So that's the government's position.

3            THE COURT:  Okay.  Thank you, Ms. Rich.

4            I see that we have the Marshals Service here this

5    morning.  Mr. McClung, if you can come forward.

6            Mr. McClung, if you could state your name for the

7    record.

8            THE U.S. MARSHAL:  Mike McClung.

9            THE COURT:  Mr. McClung, we appreciate you being here

10   this morning.  What is your role with respect to federal

11   defendants who are housed at local jails?

12           THE U.S. MARSHAL:  I'm the prisoner operation

13   supervisor here, so I help maintain any type of medical issues

14   that a prisoner runs into at one of our facilities.

15           THE COURT:  And were you able to hear all of the

16   testimony elicited both from Dr. Abdullah and Mr. Johnson?

17           THE U.S. MARSHAL:  I was, Your Honor.

18           THE COURT:  Do you have any additional thoughts to

19   offer, other than that which has been articulated by

20   Mr. Mayberry and Ms. Rich?

21           THE U.S. MARSHAL:  No, Your Honor.  I believe the

22   jail will be able to accommodate Ms. Kuc at their facility

23   outside of the hand shower they were discussing.  I don't know

24   if she'll be able to see a provider today.  It will depend on

25   when she returned with the jail run.  But, certainly, she'll be

                    UNITED STATES DISTRICT COURT

1    seen in the next day or so and they will then relay her out.

2    After the medical director sees her, Dr. Kyle, they usually

3    contact my offices, we'll approve a prisoner medical request

4    and have her seen by a specialist at their direction.

5         THE COURT:  Does that occur -- when I say "that," the

6    defendant being seen by a specialist, does that occur inside

7    the jail or outside the jail?

8         THE U.S. MARSHAL:  Outside the facility.

9         THE COURT:  Okay.

10        THE U.S. MARSHAL:  After the medical director or

11   whoever -- whatever doctor is on duty that day sees her, they

12   typically contact our office, provide with us a set of exam

13   notes where they refer us to send her out to a specialist.  I

14   then approve it, return it to the jail, they then set up the

15   appointment.  Like Mr. Johnson was saying, it may take some

16   time to set up to see a specialist.  But they should be able to

17   find one within a week or so.

18        THE COURT:  If there's a specialist already

19   identified, based on your experience, how long would it take

20   for that specialist to be arranged to see the defendant?

21        THE U.S. MARSHAL:  It will be a scheduling thing on

22   the jail, based on their schedule when they can take her there

23   and back.  They do take a lot of other in-custody out on

24   medical appointments.  Probably within five to seven days, I

25   would imagine.

                    UNITED STATES DISTRICT COURT

```
 1            THE COURT:  Okay.  Today is Monday the 5th.  Any

 2   reason to think the jail can't accommodate that, assuming all

 3   the things that just occurred, accommodate that by a week from

 4   today?

 5            THE U.S. MARSHAL:  It will depend if they can find a

 6   specialist.  I know Mr. Mayberry said the doctor who just

 7   testified was one that was available.  I don't know about the

 8   availability in the area.  I don't know what his schedule is as

 9   far as his vacation.

10            THE COURT:  Let me just -- again, if the parties

11   would direct the questions to the Court.  That's something I

12   can address with Mr. Mayberry.

13            Do the parties have any questions for Mr. McClung?

14            Mr. Mayberry, it's your motion, I'll begin with you.

15   You had expressed some concerns about the jail.  The Court has

16   not ruled on your motion, but --

17            MR. MAYBERRY:  Mr. McClung, the doctor is ultimately

18   the one that determines whether or not they see the specialist.

19   Is that correct?

20            THE WITNESS:  Yes, sir.  That's correct.

21            MR. MAYBERRY:  You're not a doctor.  Right?

22            THE WITNESS:  No, I'm no not.

23            MR. MAYBERRY:  So in a doctor says, "No, they can't

24   see a specialist," your -- you can't override that?

25            THE WITNESS:  They would never refer a medical
```

UNITED STATES DISTRICT COURT

1    situation to me, so I wouldn't particularly know about it.

2              MR. MAYBERRY:  All right.  I have nothing further.

3              THE COURT:  Ms. Rich, anything for Mr. McClung?

4              MS. RICH:  No, Your Honor.

5              THE COURT:  Thank you, Mr. McClung.  We appreciate

6    your --

7              THE U.S. MARSHAL:  Thank you, Judge.

8              THE WITNESS:  -- appearing here this morning.

9         Mr. Mayberry, a fair amount of the argument that

10   you've made here is based upon speculation as to what is going

11   to happen.  It sounds to me like in terms of your gatekeeper

12   argument, much will be known about that in the next 24 to 48

13   hours.  And then with respect to Dr. Abdullah, he's locum

14   tenens here in Tampa, Florida?

15             MR. MAYBERRY:  Yes, Your Honor, he is.

16             THE COURT:  And he's, obviously, as he indicated, in

17   Pakistan.  So irrespective of whether Ms. Kuc were inside or

18   outside the jail, outside of the hand shower, to see a

19   specialist, you're proposal would be that it would be

20   Dr. Abdullah.  How soon can Ms. Kuc, whether inside or outside

21   the jail, see Dr. Abdullah?

22             MR. MAYBERRY:  I believe he's going to be back this

23   week.  But I don't recall what day he said he was going to be

24   back.  He does have a partner within his office, Dr. Arviv.  I

25   would have to contact them to see if she does this kind of work

1  or not.  I'm assuming no, which is why she got me connected to

2  him.

3          So my best estimate, Your Honor, is that he would be

4  back by the end of this week, and then if -- you know, if she's

5  to see him, it would probably have to be end of next week if

6  we're using Dr. Abdullah.  He's the one that I was able to

7  find.  He's the only one I was able to find while I was doing

8  my search.

9          THE COURT:  Certainly if you had somebody else, I'm

10 sure that that's something that can be discussed in light of

11 what Mr. Johnson testified to, which is the need to identify

12 somebody.  Perhaps I'm being too presumptive in this regard,

13 but it seems to me that if you've already identified a

14 physician who can examine your client whether inside or outside

15 the jail, it would seem that that would suffice for the

16 purposes of Mr. Johnson's inquiry, assuming that that were

17 directed by the examiner who looks at Ms. Kuc.  Any reason to

18 think otherwise?

19          MR. MAYBERRY:  I mean, if he's --

20          THE COURT:  You say "he's," you're referring to?

21          MR. MAYBERRY:  Dr. Abdullah.  If Dr. Abdullah is

22 given an opportunity, I'm sure he will comply and would do it.

23          THE COURT:  Okay.  Ms. Rich, any reason to think that

24 the jail would not -- if it were to believe that an examiner is

25 necessary, allow or designate Dr. Abdullah to be the one who

UNITED STATES DISTRICT COURT

1    will do the -- would be the specialist who would conduct the

2    examination?

3           MS. RICH:  I don't see why they would have a problem

4    with that.  I haven't asked Mr. Johnson that specific question.

5    I don't know if they have specialists they refer to.  But if

6    they've already identified who they want her to see, I don't

7    see why they wouldn't be willing to allow that.

8           THE COURT:  Okay.  I'm going to continue this matter,

9    and I'm -- at this point, I'm contemplating for another week or

10   ten days until midweek of next week.  What I've heard from the

11   testimony today is that outside of the hand shower, all of

12   Ms. Kuc's needs would be satisfied between now and time the

13   parties would next come in.

14          But in between now and then, a number of things would

15   occur.  First, there would be somebody at the jail who would

16   examine the defendant.  I understand, Mr. Mayberry, that

17   efforts were undertaken perhaps in the past to do that and

18   there was perhaps some resistance there by your client.  But I

19   haven't heard anything more about that.  But I'm sure your

20   client would, I would assume, be cooperative with the jail's

21   efforts.  And you're nodding your head.  I take that as an

22   affirmative response.

23          MR. MAYBERRY:  She -- yes, Your Honor.

24          THE COURT:  And that as far as the dilators and all

25   the other care that's necessary, that that would be undertaken

1    by your client in good faith between now and then and the Court

2    can evaluate this in an informed manner.  I take it that would

3    be what your client would undertake?

4           MR. MAYBERRY:  Yes.

5           THE COURT:  We would have an answer as to what the

6    jail had said.  We would also have an answer from Dr. Abdullah

7    about a possible scheduling of an examination, as to whether

8    other things were needed.

9           And, Mr. Mayberry, if the hand shower is the item

10   that this issue turns on heavily, I know that you have

11   interpreted Dr. Abdullah's testimony to place a heavy emphasis

12   on that one item, such that it could be dispositive.  I did not

13   hear his testimony, at least on first listening, to be that

14   emphatic as to a hand shower, as opposed to a number of other

15   items or mechanisms or manners of cleansing that can be

16   utilized in addition or this case.  I would need to hear

17   something more specific on that before I would place the kind

18   of emphasis that you would on that to the extent that in the

19   end is material.  So I'll leave it to you as to best how to

20   address that and Ms. Rich as well.

21          So, Mr. Mayberry, I will begin with you.  I'm looking

22   at roughly a week or ten days, which would allow all of these

23   things that have now come up to fall into place, including the

24   dilation and the hormonal treatment, which I understand to be

25   ongoing.  Do you have a preference?  I want to make sure that

UNITED STATES DISTRICT COURT

1    the parties are ready for that hearing.  In other words, some

2    of these questions have been answered and to the extent the

3    arguments have -- are speculative, there's some more certainty

4    about them and then the Court can address the broader issues,

5    again, not intimating how it would rule in the end.

6              MR. MAYBERRY:  Today is the 5th.  I would say, if

7    Your Honor would allow towards possibly midweek next week,

8    towards the end of next week, I think that would give

9    sufficient time for me to speak with Dr. Abdullah if he is

10   coming back within the next five days, give him a little bit of

11   time.  Because I'm sure that when he comes back, he's going to

12   have things he's going to have to take care of in his office.

13   But then perhaps if he's back and Your Honor were to hear from

14   him further, he could be available, or I could at least have an

15   answer back for you on terms of the evaluation.  And if he says

16   yes, then maybe they can just get that ball rolling in the

17   meantime.

18             THE COURT:  Okay.  Ms. Rich, does that work for you?

19             MS. RICH:  Yes.  I have some sentencings next week.

20   I'm available the afternoon of the 15th, which is the Thursday

21   of next week.

22             THE COURT:  Does Thursday or Friday work well for

23   you?

24             MS. RICH:  Friday, I'm unavailable Friday.

25             THE COURT:  Okay.

1          MR. MAYBERRY:  If we could do -- would it be possible

2     Thursday two o'clock or after?

3          THE COURT:  I'm about to find out.

4          THE COURTROOM DEPUTY:  Two o'clock will work.

5          THE COURT:  Two o'clock, it appears, would work.

6     We'll schedule this matter for continuation at two o'clock next

7     Thursday, the 15th, as I understand it.  If the parties wish to

8     introduce additional factual matter, they should be prepared to

9     present testimony.  That would include Dr. Abdullah, the Court

10    will take it telephonically, or Mr. Johnson or any other

11    provider.  The Court prefers hearing testimony -- given the

12    delicacy and the involved nature of this subject matter, the

13    Court wishes to hear directly from the medical staff and

14    personnel involved.

15         Anything further, Ms. Rich?

16         MS. RICH:  No, Your Honor.

17         THE COURT:  Thank you.  Mr. Mayberry, anything

18    further?

19         MR. MAYBERRY:  No, Your Honor.

20         THE COURT:  I will have one more directive for the

21    parties.  I am instructing the parties to work closely with

22    Mr. McClung who is the liaison between the courthouse and the

23    Pinellas County Jail, that if there are issues that arise, it's

24    effectively a conferral requirement that not only involves the

25    government and the defense, but the Marshals Service as well.

UNITED STATES DISTRICT COURT

1              In other words, if there's an issue that arises,

2   Mr. Mayberry, where you're not satisfied, if you would confer

3   with Mr. McClung, so that to the extent things can be resolved

4   before you come to the courtroom, if there's another reason

5   you're seeking release that doesn't include that, to the extent

6   there's something that arises, it shouldn't be the situation

7   that if it could have been addressed by the Marshals Service

8   and resolved, that it's then brought to the Court's attention

9   in the first instance.  And I can see by the nodding of your

10  head you understand.  The same thing would be true of the

11  government.

12             Hearing nothing further from the parties, we'll be in

13  recess and continue the matter until next Thursday.  Thank you.

14             THE COURT SECURITY OFFICER:  All rise.

15      (Proceedings recessed at 10:41 a.m.)

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1        **CERTIFICATE OF REPORTER**

2    STATE OF FLORIDA

3    COUNTY OF HILLSBOROUGH

4            I, Rebekah M. Lockwood, RDR, CRR, do hereby certify

5    that I was authorized to and did stenographically report the

6    foregoing proceedings; and that the foregoing pages constitute

7    a true and complete computer-aided transcription of my original

8    stenographic notes to the best of my knowledge, skill, and

9    ability.

10       I further certify that I am not a relative, employee,

11   attorney, or counsel of any of the parties, nor am I a relative

12   or employee of any of the parties' attorneys or counsel

13   connected with the action, nor am I financially interested in

14   the action.

15       IN WITNESS WHEREOF, I have hereunto set my hand at Tampa,

16   Hillsborough County, Florida, this 21st day of April 2021.

17

18

19

20

21   _____
     REBEKAH M. LOCKWOOD, RDR, CRR
22   Official Court Reporter
     United States District Court
     Middle District of Florida

23

24

25