```
 1                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
 2                        TAMPA DIVISION

 3   UNITED STATES OF AMERICA,   )
                                 )   8:21-61-MSS-CPT
 4            PLAINTIFF,          )   Tampa
                                 )   April 22, 2021
 5            v.                  )   3:35 p.m.
                                 )
 6   EMRAH KUC,                   )
                                 )
 7            DEFENDANT.          )

 8

 9                    TRANSCRIPT OF MOTION HEARING
                 BEFORE THE HONORABLE CHRISTOPHER P. TUITE
10                  UNITED STATES MAGISTRATE JUDGE

11   APPEARANCES:

12   For the Government:
          MS. CANDACE G. RICH
13        United States Attorney's Office
          Suite 3200
14        400 N. Tampa Street
          Tampa, FL 33602-4798
15
     For the Defendant:
16        MR. JASON MATTHEW MAYBERRY
          The Mayberry Law Firm, LLC
17        3630 West Kennedy Boulevard
          Tampa, FL 33609

18

19

20

21
     Court Reporter:              Tracey Aurelio, CRR, RMR, RDR
22                                Federal Official Court Reporter
                                  801 N. Florida Avenue, 15th Floor
23                                Tampa, Florida 33602
                                  (813) 301-5448
24
                Proceedings recorded by mechanical stenography,
25   transcript produced by computer.
```

# I N D E X

DR. SHEIKH ABDULLAH
  Direct Examination (Mr. Mayberry)          7
  Cross-Examination (Ms. Rich)              14

JOEL JOHNSON
  Direct Examination (Ms. Rich)             18
  Cross-Examination (Mr. Mayberry)          23
  Redirect Examination (Ms. Rich)           28

1 _____

2      (Proceedings commenced at 3:35 p.m.)

3          THE COURT:  Good afternoon, everyone.

4          Madam Clerk, if you could please call the case.

5          THE COURTROOM DEPUTY:  It's the matter of the United

6  States of America v. Emrah Kuc, Criminal Case No. 8:21-cr-61.

7          THE COURT:  If I could please have the appearances of

8  counsel for the record beginning with the government.

9          MS. RICH:  Good afternoon, Your Honor.  Candace Rich

10 for the United States.

11         THE COURT:  Good afternoon.

12         MR. MAYBERRY:  Good afternoon, Your Honor.  Jason

13 Mayberry for Emrah Kuc.

14         THE COURT:  Good afternoon to you both.

15         I'd like, if I could before we get started, to see if

16 there's an agreement as to when the surgery at issue was

17 conducted.

18         Mr. Mayberry, you had mentioned, I believe, December

19 of 2019.

20         And, Ms. Rich, on cross-examination of Dr. Abdullah,

21 you had said, I believe, December of 2018.

22         Mr. Mayberry, I will begin with you.  I see that you

23 are looking through your notes, and I'll give you whatever

24 time you need.

25         MR. MAYBERRY:  Yes, Your Honor.  There's a document

1  that we received from Dr. Guillermo MacMillan that states that

2  in October of 2018 the surgery was performed.  I believe

3  that's a typographical error.  And I believe that any flight

4  or HSI records of Ms. Kuc leaving the United States and

5  actually going to Chile would reflect the date or the time

6  frame of when she did it, which was actually December of 2019.

7         So it's my belief, Your Honor, that this is a

8  typographical error on this letter.  And I'm comfortable in

9  saying that because I don't have HSI records that I can give

10 to Your Honor, but I believe if there was a check on Ms. Kuc

11 leaving the United States and going to the country of Chile, I

12 believe that that would reflect December of 2019.  I'm very

13 confident in that.

14        THE COURT:  Okay.  Ms. Rich?

15        MS. RICH:  Mr. Mayberry is correct.  There are

16 records of her leaving the country in December of 2019.  My

17 statement that the surgery occurred in October of 2018 was

18 based on the sworn statement that was provided to me by the

19 defense which was signed by the doctor performing the surgery.

20 So I hadn't -- I was relying on the documentation that was

21 given to me by the defense.

22        THE COURT:  So just to combine these two thoughts,

23 the sworn declaration that Ms. Rich was looking at executed by

24 the doctor who performed the surgery had a typographical error

25 as far as the date is concerned.

1          MR. MAYBERRY:  That's correct, Your Honor.  And I

2    missed that typographical error in candor to the Court.  I got

3    this, I looked at it --

4          THE COURT:  You say "this."  You're referring to --

5          MR. MAYBERRY:  When I say "this," Your Honor, I'm

6    referring to the letter from Dr. Guillermo MacMillan with IDU

7    at the top of it.  I received this letter from Dr. MacMillan

8    provided to me by a friend of my client, and then I provided

9    that to Ms. Rich.  I missed the fact that it said October of

10   2018.  But again, the surgery I believe was performed in

11   December 2019 based upon the representations of my client, her

12   family, and then what HSI records would show for travel out of

13   the country to Chile.

14         THE COURT:  Okay.  Thank you, Mr. Mayberry.

15         Ms. Rich, I wasn't suggesting that your question was

16   untoward or not well grounded.  Do you on behalf of the

17   government agree that the surgery, or at least the evidence

18   shows or indicates the surgery was performed in December of

19   2019?

20         MS. RICH:  Sure.  I will agree -- I will trust

21   Mr. Mayberry's representations that that's when it occurred,

22   yes.

23         THE COURT:  Okay.

24         All right.  With that, Mr. Mayberry, it's your

25   motion.  So I will look to you at the outset.

```
 1              MR. MAYBERRY:  Your Honor, I would ask if we would
 2   re-call Dr. Abdullah.  I've spoken with him.  I believe, Your
 3   Honor, perhaps -- I believe there is the issue of cleansing
 4   that the doctor could, I believe, expand upon for the Court to
 5   have a clearer picture.  So I'd ask if we could re-call
 6   Dr. Abdullah.  He is doing clinicals in The Villages.  He has
 7   broken off between 3:30 to 4:00 to testify telephonically if
 8   Your Honor will allow it.
 9              THE COURT:  I will allow it.  Do you have a mechanism
10   for us to get ahold of Dr. Abdullah?
11              MR. MAYBERRY:  I do.  I provided a phone number to
12   Madam Clerk.  And if we could -- I could call him from my
13   phone, but it may be -- if the Court would indulge to allow us
14   to call from the government line.
15              THE COURT:  Absolutely.  You'll be billed
16   accordingly.
17         (The following testimony occurred telephonically.)
18              THE COURT:  Dr. Abdullah, this is Judge Tuite again.
19              How are you?
20              DR. ABDULLAH:  Oh, hi, Judge.  Good.  I'm well.
21   Thank you.
22              THE COURT:  I understand that you've allotted a
23   little bit of time this afternoon to provide further testimony
24   in the Emrah Kuc matter.  Are you still available to do so?
25              DR. ABDULLAH:  Yes, I am.
```

DIRECT EXAMINATION OF DR. SHEIKH ABDULLAH

1          THE COURT:  I'm going to have my courtroom deputy

2   swear you in.

3          DR. ABDULLAH:  Okay.

4          THE COURTROOM DEPUTY:  If you could please raise your

5   right hand.

6      (Witness sworn.)

7          THE COURTROOM DEPUTY:  Thank you.

8          Can you please state your name for the record.

9          THE WITNESS:  Dr. Sheikh Ahmed Abdullah.

10          THE COURT:  And, Mr. Abdullah, if you would do us the

11   kind favor of, as best you can, speaking slowly and

12   distinctly.  The audio quality in the courtroom is good, but

13   it will degrade if you don't speak slowly and distinctly.

14          THE WITNESS:  Sure.

15          THE COURT:  Okay.  Mr. Mayberry?

16          MR. MAYBERRY:  Your Honor, may I inquire at the

17   lectern?

18          THE COURT:  You may, yes.

19      **DR. SHEIKH ABDULLAH, CALLED BY THE DEFENDANT, SWOR**N,

20                      **DIRECT EXAMINATION**

21   BY MR. MAYBERRY:

22   Q    Good afternoon, Dr. Abdullah.

23   A    Hi.  How are you?

24   Q    I'm doing well, sir.

25          Doctor, in your last testimony on March 26, we

DIRECT EXAMINATION OF DR. SHEIKH ABDULLAH

1   discussed briefly what the best methods would be for proper

2   hygiene of an individual that has a neovagina.  Do you

3   remember discussing that with me and the Court?

4   A    Yes, I do.

5   Q    Okay.  And, Doctor, just generally what is your

6   recommendation for how to best clean or how to maintain best

7   hygiene in terms of bathing for someone with a neovagina?

8   A    Well, I think, like I said, the best way to do it is

9   running water.  And running water means a hand shower or some

10  device like that that would make the water flush the neovagina

11  out.  And so that would be the best way to keep it clean.

12           An alternative, which is not ideal, but could be -- a

13  douche.  A douche is a very low volume, low pressure system

14  that cleans out to some extent but not really well.

15           The problem with the neovagina is that, you know,

16  they don't have enough fluid formation and mucus formation to

17  (unintelligible) and be kept clean on their own by just

18  washing externally.

19  Q    And, Doctor, when you say hand shower, is that -- does

20  that mean the same thing as like a removable shower head?

21  A    Sure.  Anything that can be manipulated with the hand and

22  grasped underneath so that the water flushes up and into the

23  neovagina and washes and flushes it out.

24  Q    And the reason that that's better than a douche is

25  because of the water pressure that can flush; is that correct?

DIRECT EXAMINATION OF DR. SHEIKH ABDULLAH

1  A     A lot of water pressure and the volume.

2  Q     And you mentioned that fluid formation or mucus formation

3  can occur.  Why is it better to have a hand shower for

4  purposes of avoiding that?

5  A     Well, basically when the individual fluid forms in that

6  area from secretion, it's better.  That is -- that can be a

7  (unintelligible) for bacterial colonization.  And when you get

8  bacterial colonization, you get enough colonization and

9  bacteria load, you can get an infection.  And most commonly

10 the infection starts in the urinary tract because

11 (unintelligible) that bacteria from the vagina can be passed

12 up towards the (unintelligible), and I believe this when

13 patient has a urinary tract infection is not a big surprise.

14 She understands keeping things clean, clean as possible

15 because urinary tract infection would be the first sign of

16 infection.  Not necessarily you get infection in the neovagina

17 itself, but that would be -- I mean, even when that happens,

18 that's really catastrophic.

19         THE COURT:  I couldn't understand that last word,

20 Doctor.  If you could keep your voice up just a bit if you

21 wouldn't mind.

22 A     The neovagina getting infected itself, the high bacteria

23 load, that's really catastrophic in the sense that they'd get

24 septic in there.

25         THE COURT:  Mr. Mayberry, did you understand the last

DIRECT EXAMINATION OF DR. SHEIKH ABDULLAH

1  portion of that sentence?

2  BY MR. MAYBERRY:

3  Q    I didn't, Doctor.  Could you please repeat -- you had

4  mentioned something about septic.

5  A    An infection in the neovagina can be catastrophic because

6  it can make the patient septic.

7  Q    And if -- when you say "septic," do you mean septicemia?

8  Can you explain that, what that means?

9  A    Yes.  What that means is that the bacteria is getting

10  into the cells of the neovagina and into the tissues

11  themselves and then into the bloodstream.  And bacteria in the

12  bloodstream means septicemia.  And that, of course as we all

13  know, can lead to organ failure if not treated appropriately

14  and immediately.  So that's what I mean by catastrophic.

15  Q    What are the dangers of somebody becoming septic?

16  A    Death.  I mean septicemia is nothing to be taken lightly.

17  Once somebody gets septic and gets into organ failure, then

18  basically it's very difficult for them to come out of it even

19  with antibiotics.  Early, early septicemia can be treated with

20  antibiotics and people do okay.  But late septicemia usually

21  results in death.

22  Q    And is it a true statement that the septicemia can be

23  caused by the colonization or occurrence of the bacteria in

24  the neovagina?

25  A    Can it happen?  Yes, it can happen.  Thankfully not very

DIRECT EXAMINATION OF DR. SHEIKH ABDULLAH

1  common, but it can happen depending on the bacteria load and

2  the buildup, et cetera.  And that's why it's important to keep

3  the neovagina clean.

4  Q    Okay.  And you mentioned that there was an alternative to

5  using a hand shower or a removable shower head.  Why is it

6  that there is such an advantage of one over the other?  Could

7  you explain that in detail, please?

8  A    Well, like I said, the two alternatives are a hand shower

9  or a douche.  A douche is a small bottle with a low volume of

10  liquid in it that is squirted into the neovagina and let it

11  drip out.  So there is not a lot of pressure to it, and it's

12  just, you know, the volume is pretty low.  So it doesn't

13  really clean as well as obviously a shower head that is

14  shooting water up there and you can hold it for as long as you

15  want.  The volume and the pressure of the shower head is just

16  so much better than a douche.  Uses 20 different douches and

17  then they might get the volume, but they'll never get the

18  pressure built up enough with the douche bottle to really wash

19  the space out.

20  Q    Just to clarify, Doctor, and you may have already said

21  this but I just want to make it clear.  In your experience, is

22  there a higher risk for infection in using one method for

23  cleansing over the other?

24  A    Well, yes, of course.  In my opinion the douche is

25  inadequate to clean unless you douche, you know, 20 times a

DIRECT EXAMINATION OF DR. SHEIKH ABDULLAH

1  day or really wash that out, whereas a couple times a day for

2  a half hour the high-power washer.  Basically the power

3  washer, the hand shower has more power and more volume of

4  water to clean up all the crevice, et cetera, of the neovagina

5  much better than the, you know, 20 douches would be in my

6  opinion.

7  Q    Okay.  And you mentioned urinary tract infection earlier.

8  Can a urinary tract infection be caused by inadequate

9  cleansing?

10  A    Urinary tract infection is caused by -- usually caused by

11  inadequate cleansing.

12  Q    Okay.

13  A    The instruction is clean (unintelligible) --

14  Q    Doctor, how does one test for a urinary tract infection?

15  A    Well, you can do a urine test.  A urine test whether it

16  grows bacteria and is an indicator of a urinary tract

17  infection.  And then of course you have to look at the

18  clinical picture in which the patient has chills, et cetera,

19  and burning, burning of the urine.  So all those are signs and

20  symptoms.  And urine test, culture urine test and culture and

21  lab analysis of the urine, that will tell you if you have a

22  urinary tract infection.

23         THE COURT:  Dr. Abdullah, this is Judge Tuite again.

24  Sometimes you fade off a bit and then we can't understand what

25  you're saying.  So if you could enunciate just perhaps in a

DIRECT EXAMINATION OF DR. SHEIKH ABDULLAH

1  pronounced way, it would help us.

2         THE WITNESS:  I will try.  Thank you.

3         THE COURT:  Thank you.

4  BY MR. MAYBERRY:

5  Q    Doctor, if a person does the urine test to test for a

6  urinary tract infection, is it easily identifiable if they

7  have a urinary tract infection for someone who is medically

8  trained?

9  A    Yes.  Usually it is, absolutely.  I mean, that's the

10  test, the primary test for a urinary tract infection is a

11  urinalysis and urine cultures.

12  Q    When you do a urine test from a urinary tract infection,

13  what's actually being tested?

14  A    The urine itself.  So you take the urine from the patient

15  in a shallow cup and then you check for various levels of

16  white blood cell counts and bacteria, actual bacteria.  And

17  that's how you test for to see if the urine is contaminated.

18  And then of course if there is bacteria there, then you would

19  culture it, culture the urine in petri dishes and see what

20  grows and identify the bacteria that way.

21         MR. MAYBERRY:  Thank you, Doctor.  That's all the

22  questions that I have.

23         Thank you, Your Honor.

24         THE COURT:  Thank you.

25         Any cross-examination, Ms. Rich?

CROSS EXAMINATION OF DR. SHEIKH ABDULLAH

1          MS. RICH:  Yes.

2                    **CROSS-EXAMINATION**

3    BY MS. RICH:

4    Q    Good afternoon, Dr. Abdullah.

5    A    Good afternoon.

6    Q    We have talked about douching as an alternative to the

7    hand shower.  Would a sitz bath also be an alternative?

8    A    No.  A sitz bath is not an alternative, not a good

9    alternative at least for the purpose that we're trying to do.

10   A sitz bath is sitting in a pool of water.  And you have them

11   put their finger in and wash it out.  Running water -- it's

12   not running water.  So I'm not saying a sitz bath and a

13   Whirlpool and then they washing it out with their finger in a

14   way that's kind of cleaning it, again it's not going to do the

15   same thing as a stream of water running in, washing it out and

16   then coming out again.  It's a little different.

17   Q    What about a perineal irrigation bottle, is that an

18   alternative?

19   A    No.  That's the same as a douche.  So a douche is just

20   basically a bottle full of saline or whatever, a substance

21   available for douching.  And you squirt that in and let it

22   drip out.  It's a small amount with low pressure.  So a

23   perineal bottle is the same as a douche.  They're similar.

24   Q    Between the douche and the perineal irrigation bottle, is

25   there one that's preferred over the other?

CROSS EXAMINATION OF DR. SHEIKH ABDULLAH

1  A    I don't.  I mean, whatever is available.  Most people can

2  try and douche if you give them a perineal bottle.

3          MS. RICH:  Okay.  I don't have any other questions.

4          THE COURT:  I couldn't understand that last answer,

5  Dr. Abdullah.  If you could speak louder and more distinctly.

6  A    So the difference between a perineal bottle and a douche

7  is not huge.  They're both small devices with -- that squirt

8  water out and are filled with saline or whatever douche

9  washing solution is available.  And then you just squirt that

10 into the neovagina and then it drips out.  So they both work

11 very much on the same principle.  The perineal bottle you

12 might have a little more volume than in a douche.  The

13 pressure is about the same.  So I don't have a preference

14 between the two simply because perineal bottles are not easy

15 to find on the market for most customers or consumers.  The

16 douche is very easy to find, and they are practically the

17 same.

18         THE COURT:  Okay.  Mr. Mayberry, any redirect?

19         MR. MAYBERRY:  No, Your Honor.

20         THE COURT:  Thank you.

21         Dr. Abdullah, I have a question for you.

22         THE WITNESS:  Sure, Your Honor.

23         THE COURT:  If the douching was not adequate and it

24 led to some kind of infection or some kind of problem, would

25 that be detectable to a health care provider who would be

CROSS EXAMINATION OF DR. SHEIKH ABDULLAH

1   examining the patient?

2          THE WITNESS:  Yeah.  The first thing I would look for

3   is a urinary tract infection.  The urinary tract infection,

4   that's coming from somewhere.  And I suspect that's from

5   inadequate cleanliness from inadequate washing after the

6   douche.  So that's the first thing I'd look for.

7          And then I would probably examine the neovagina and

8   see what kind of buildup there is in there.  If the douche is

9   ineffective or not, then you would know that.  But that would

10  take a trained eye to determine that or not.

11         THE COURT:  And would somebody -- forgive the

12  question to some extent, but I want to make clear for the

13  record.  Would somebody who has a urinary tract infection have

14  symptoms?

15         THE WITNESS:  Yes.  The symptoms are the burning when

16  they urinate, and that's the most common symptom.  They may

17  have fevers.  With urinary tract infections you can cause more

18  systemic blood infection and so -- and the frequency would be

19  another one.  They go to the bathroom a lot.  They feel like

20  they need to go and nothing comes out.  So those are the

21  symptoms of a urinary tract infection for sure.  The later

22  urinary tract infection will have fevers, et cetera, also.

23         THE COURT:  And just so I understand, you mentioned

24  that the urinary tract infection can be treated by

25  antibiotics.

CROSS EXAMINATION OF DR. SHEIKH ABDULLAH

1              THE WITNESS:  That's correct.

2              THE COURT:  So if somebody became symptomatic with a

3     urinary tract infection and reported that, would that be

4     treatable by antibiotics?

5              THE WITNESS:  It should be.  Especially if it's early

6     enough, then it can be treated with antibiotics, yes.

7              THE COURT:  I couldn't quite understand that last

8     part of your answer.

9              THE WITNESS:  Yes, it can be treated with

10    antibiotics.  Certainly early urinary tract infections can be

11    treatable by antibiotics by mouth.  But if it gets more

12    severe, then they would need IV antibiotics.

13             THE COURT:  Okay.  Thank you, Doctor.

14             Any follow-up on my questions, Mr. Mayberry?

15             MR. MAYBERRY:  No, Your Honor.

16             THE COURT:  Thank you.

17             Ms. Rich?

18             MS. RICH:  No, Your Honor.

19             THE COURT:  Thank you.

20             Thank you, Dr. Abdullah.  We appreciate you taking

21    time out of what I understand is a hectic schedule.

22             THE WITNESS:  Not a problem, Judge.  Thank you.

23         (Phone call ended.)

24             THE COURT:  Mr. Mayberry, any other proof or

25    witnesses?

DIRECT EXAMINATION OF JOEL JOHNSON

1        MR. MAYBERRY:  No other witnesses, Your Honor.  Just

2   argument, I guess.

3        THE COURT:  Okay.  Thank you.

4        Ms. Rich, any evidence that you wish to tender, any

5   witnesses you wish to call?

6        MS. RICH:  Yes.  Just Mr. Joel Johnson with the jail.

7   And I have provided his phone number so we can call him.

8        THE COURT:  Madam Clerk, if you would.

9      (The following testimony occurred telephonically.)

10        THE COURT:  Mr. Johnson, this is Judge Tuite.  How

11   are you?

12        MR. JOHNSON:  I'm well.  Thank you, sir.

13        THE COURT:  You are here in open court on

14   teleconference, and I'm going to have the courtroom deputy

15   here swear you in.

16        THE COURTROOM DEPUTY:  If you could please raise your

17   right hand.

18      (Witness sworn.)

19        THE COURTROOM DEPUTY:  Thank you.

20        If you would please state your name for the record.

21        MR. JOHNSON:  Joel Johnson.

22        THE COURT:  Ms. Rich?

23        MS. RICH:  Thank you.

24        **JOEL JOHNSON, CALLED BY THE GOVERNMENT, SWORN**

25                **DIRECT EXAMINATION**

DIRECT EXAMINATION OF JOEL JOHNSON

1  BY MS. RICH:

2  Q    Good afternoon, Mr. Johnson.

3  A    Good afternoon.

4  Q    Just to follow up on the care being provided to Ms. Kuc

5  at the Pinellas County Jail, in addition to making regular

6  douching available to Ms. Kuc, do you also have the ability to

7  offer her a perineal irrigation bottle should she choose to

8  use that instead of douching?

9  A    We do.  We can do that as suggested by the nurse

10 practitioner that's caring for her.

11 Q    And prior to this afternoon's hearing, have you had an

12 opportunity to review the notes from the medical exams and the

13 various appointments that Ms. Kuc has had with the medical

14 staff at the jail?

15 A    I have.

16 Q    With respect to douching, has Ms. Kuc, based on your

17 review of the records, has she ever requested the opportunity

18 to douche?

19 A    No.  I haven't seen any evidence of that in the chart.

20 Q    And has the medical staff offered her the opportunity to

21 do that?

22 A    I don't think so, no.

23 Q    Had Ms. Kuc ever requested the opportunity to douche,

24 would the jail have made that available to her as frequently

25 as she wanted it?

DIRECT EXAMINATION OF JOEL JOHNSON

1    A    Yeah.

2    Q    Going forward if Ms. Kuc asks to be able to douche every

3    day several times a day, would the jail accommodate that

4    request?

5    A    We would.

6    Q    Same thing with the perineal irrigation bottle.  If she

7    asked to have the opportunity to use that every day several

8    times a day, would the jail allow Ms. Kuc to do that?

9    A    Yes.  I believe that's a device that they would probably

10   give her and let her keep it on her person so she would be

11   free to use it all day long if she wanted to.

12   Q    Just to turn for a moment to the dilation.  I know we've

13   talked about that at prior hearings.  Since the last hearing

14   when we were before the Court, has the jail offered Ms. Kuc

15   the opportunity to do the dilation process?

16   A    Yes.  I believe we've offered 34 times we've given her

17   the opportunity to dilate.

18   Q    And of the 34 times, has Ms. Kuc ever refused the

19   opportunity to do the dilation?

20   A    Yes.  She has refused 12 times.

21   Q    And of the times where she did choose to dilate, how much

22   time was allotted for the dilation to take place?

23   A    Well, the order is for two hours for each session, but

24   she's typically no more than 35 or 40 minutes each time.

25   Q    So just to be clear, based on the order from the Court,

DIRECT EXAMINATION OF JOEL JOHNSON

1  the jail is to allow her a dilation period of two hours each

2  time she is allowed to dilate?

3  A    Correct.  Two hours, three times a day.  That's how the

4  order is written.

5  Q    And that's what's been made available to Ms. Kuc since

6  that order was entered, correct?

7  A    Correct.

8  Q    And to clarify your testimony, during the times when

9  Ms. Kuc did choose to dilate, she didn't use the full two

10  hours; is that right?

11  A    Correct.  She would complain maybe of soreness or

12  something after a short amount of time and end it prematurely

13  of her own volition.

14  Q    At any of those dilation appointments, did the jail ever

15  stop the dilation earlier, or was it always done at Ms. Kuc's

16  request?

17  A    100 percent at her request.

18  Q    We've also discussed at prior hearings that if the

19  dilation is working correctly, then the opening should become

20  larger, and then potentially a new dilation device would be

21  needed to accommodate the larger opening.  Do you recall that?

22  A    Correct.  She brought -- we did finally get her personal

23  devices.  And she has, I think, six different ones that are a

24  different size on each end.  We put most of them in her

25  property and kept the smallest two.  So there is an

DIRECT EXAMINATION OF JOEL JOHNSON

1  opportunity for four increases in size, or three increases

2  rather.  And so far she has been able to use the very smallest

3  one.  And just lately in the last few days or what have you,

4  she has increased one size up.

5  Q    Since Ms. Kuc's time in custody, has she been diagnosed

6  with a UTI?

7  A    She has.  We had to treat her -- we are currently

8  treating her with ciprofloxacin.

9  Q    When was she diagnosed with that UTI?

10 A    The 19th.

11 Q    Of this month, of April?

12 A    April 19.  Sorry.

13 Q    And since the diagnosis, has she been prescribed an

14 antibiotic to treat that UTI?

15 A    Yes.  Ciprofloxacin.

16 Q    We also discussed at the last hearing that if the jail

17 thought it would be appropriate for Ms. Kuc to be seen by an

18 outside provider, that the jail would, one, make that

19 recommendation and allow that evaluation to take place.  Do

20 you recall that?

21 A    I do.

22 Q    Did the jail staff make a determination as to whether or

23 not Ms. Kuc needed to be seen by a specialist outside of the

24 jail?

25 A    Yes.  They -- the doctor decided she probably should see

CROSS EXAMINATION OF JOEL JOHNSON

1  a plastic surgeon that is familiar with this type of surgery,

2  and also we wanted her to see a urologist.  So she has seen a

3  urologist once, and she has a follow-up visit in about six

4  months.  And then we've scheduled an appointment with

5  Dr. Abdullah who testified during the last hearing.

6  Q    Do you know when the appointment is with Dr. Abdullah?

7  A    I do.  For security reasons I probably shouldn't mention

8  when, but it is within the next week.

9  Q    Okay.

10       MS. RICH:  Thank you, Mr. Johnson.  I don't have any

11  further questions.

12       THE COURT:  Thank you, Ms. Rich.

13       Mr. Mayberry, any cross-examination?

14       MR. MAYBERRY:  Briefly, Your Honor.

15                     **CROSS-EXAMINATION**

16  BY MR. MAYBERRY:

17  Q    Good afternoon, Mr. Johnson.  Jason Mayberry.

18  A    Good afternoon.

19  Q    Mr. Johnson, you were present telephonically during the

20  March 26 hearing; is that right?

21  A    I was.  That's correct.

22  Q    You were able to listen to the testimony of Dr. Abdullah?

23  A    Absolutely.

24  Q    And did you recall him testifying as to cleansing with a

25  hand shower?

CROSS EXAMINATION OF JOEL JOHNSON

1  A    I do recall that, yes.

2  Q    Do you recall him testifying about cleansing with a --

3  the ability to use a douche?

4  A    I do recall that also.

5  Q    Okay.  And you testified at the hearing that the jail

6  couldn't accommodate a hand shower; is that right?

7  A    That is true.  We have two places that there is a hand

8  shower but those are for men.  Those areas are in men's pods.

9  So for women there is no such facility.

10 Q    So based on that, the only alternative for proper

11 cleansing based upon Dr. Abdullah's testimony would be for her

12 to be able to use a douche; is that right?

13 A    Well, actually I hadn't considered a couple of

14 alternatives that when I mentioned the douching again to our

15 provider, she came up with a couple of good alternatives to

16 that.  A sitz bath, that's something that you sit in and you

17 put water and it sort of shoots water up into your perineal

18 area.  And also, which is probably a better idea for her, is a

19 perineal irrigation bottle.  That's something that she can

20 keep with her, take it into the shower, fill it with water and

21 use it.  Pretty much would have the same function as a hand

22 shower.

23 Q    Okay.  Have any of these been offered to Ms. Kuc?

24 A    Not to this point, no, but they will be following this

25 hearing.

CROSS EXAMINATION OF JOEL JOHNSON

1  Q     And you do recall testimony from Dr. Abdullah on March 26

2  attesting that a douche would be necessary for proper hygiene?

3  A     I do.  And I recall speaking to the practitioner about

4  that after, but I guess it never came up during her visit with

5  Ms. Kuc.  So it was never ordered.  She never really told the

6  practitioner that she needed it or wanted it.  So I guess, you

7  know, it just didn't get ordered, but that's something that

8  we're going to rectify today.

9  Q     Mr. Johnson, in your role at the jail, do you physically

10  see the taking of medical notes from medical staff at the jail

11  every time they take them?

12  A     Oh, no.  Of course not.

13  Q     Okay.

14  A     I just read the notes after.

15  Q     It's possible then that if a request was made of the

16  medical staff for a douche, that it may not have made it into

17  a record?

18  A     Oh, of course that's possible.  It's unlikely but it's

19  possible.

20  Q     Okay.  Is it possible that that could have occurred on

21  April 14?

22  A     Of course.

23  Q     Same question as to April 20.  It's possible that a

24  douche could have been requested on April 20 and not made it

25  into the medical record?

CROSS EXAMINATION OF JOEL JOHNSON

1  A    Anything is possible.  I don't see -- no, that's

2  possible.  Who would she have been asking?  One of the nurses?

3  Q    Any medical staff member.  Yeah, a nurse.  I can't answer

4  that question, Mr. Johnson.  I'm not there.

5  A    Okay.  Okay.  Yeah, it's possible that she asked and it

6  did not get documented.  Of course.

7  Q    Okay.  And you testified before that she had only

8  advanced to the second smallest dilator; is that right?

9  A    That's correct.

10 Q    Okay.  And it's certainly possible that she hasn't

11 advanced to that point because she's in pain?

12 A    Right.  That is true.  It could be a little uncomfortable

13 to go too quickly.  So that's absolutely true.  And that could

14 also be why she had some refusals.  If it's getting to be

15 uncomfortable, you know, it's perfectly acceptable for her to

16 refuse.

17 Q    Okay.  And you'd agree that she does currently have a

18 urinary tract infection per a diagnosis on April 19; is that

19 right?

20 A    Correct.  She's currently being treated with an

21 antibiotic for a urinary tract infection.

22 Q    And that diagnosis was made by a urologist?

23 A    Well, we did a urine culture.  We collected urine, sent

24 it to the lab and got a result back that indicated that she

25 had E Coli in her urine.

CROSS EXAMINATION OF JOEL JOHNSON

1   Q    When did you get that result back?

2   A    The 21st.

3   Q    Okay.  So the actual diagnosis of the UTI was on April 19

4   made by the urologist that's outside of the jail, correct?

5   A    Yes.  I believe that's true.

6   Q    Okay.  And she took a urine test with the jail on

7   April 17?

8   A    She did.  She did it with a urine dipstick, and it did

9   not show that she had a urinary tract infection.

10  Q    Okay.  So she wasn't diagnosed with a urinary tract

11  infection by any personnel at the jail?

12  A    Yeah.  I guess that's true.  She got diagnosed on the

13  19th.

14  Q    And when was the --

15  A    That would have been the urologist.

16  Q    And Mr. Johnson, I know you are just kind of the

17  gatekeeper here.  I'm questioning you on this, and I know a

18  lot of this is not your responsibility.  But the -- when was

19  the urologist appointment set for Ms. Kuc?  When was it set

20  for her to go?  Not when did she actually go, but when did the

21  actual scheduling of that appointment occur?

22  A    It was ordered on the 5th of April.  I don't know

23  exactly.  I don't think my computer will show me what date it

24  was actually scheduled.  I'm scrolling through here.  It was

25  approved on the 6th by our medical director.  Yeah.  The

REDIRECT EXAMINATION OF JOEL JOHNSON

1  actual date that they called and made the appointment is not

2  listed here.  It was ordered on the 5th, approved on the 6th,

3  and then she went out on the 19th.

4  Q    Okay.

5         MR. MAYBERRY:  Your Honor, I don't think I have

6  anything further.

7         THE COURT:  Thank you, Mr. Mayberry.

8         Any redirect, Ms. Rich?

9         MS. RICH:  Yes.

10                    **REDIRECT EXAMINATION**

11  BY MS. RICH:

12  Q    Mr. Johnson, the jail has the ability to test inmates for

13  UTIs, right?

14  A    Correct.  We do it two different ways.  Generally we'll

15  do a urine dip, a dipstick.  That's just kind of a cell-side

16  thing that we can do.  Sometimes they will send a urinalysis

17  to the lab.

18  Q    Okay.  But the jail has the ability to determine whether

19  or not one of its inmates has a UTI, right?

20  A    Correct.

21  Q    And if an inmate in fact does test positive for a UTI,

22  the jail then also has the ability to prescribe medication to

23  treat that UTI; is that right?

24  A    Of course.

25  Q    And on April 17, the jail in fact tested Ms. Kuc for a

REDIRECT EXAMINATION OF JOEL JOHNSON

1  UTI, didn't it?

2  A     We did.

3  Q     And that test came back negative, right?

4  A     It did.  It did.

5  Q     And then two days later is when she had her preexisting

6  appointment with the urologist; is that correct?

7  A     Correct.

8         MS. RICH:  Thank you.  I have nothing further.

9         THE COURT:  Thank you, Ms. Rich.

10        Anything further, Mr. Mayberry?

11        MR. MAYBERRY:  No, Your Honor.

12        THE COURT:  Thank you.

13        Mr. Johnson, thank you again for making time out of

14  your day to testify here this afternoon.  Your testimony has

15  concluded and you're excused.

16        THE WITNESS:  Thank you, Your Honor.

17        THE COURT:  Thank you.

18     (Phone call ended.)

19        THE COURT:  So as I understand it, Mr. Mayberry,

20  Ms. Kuc is going to see Dr. Abdullah at some point in the next

21  week --

22        MR. MAYBERRY:  Your Honor --

23        THE COURT:  -- or thereabouts.

24        MR. MAYBERRY:  I know that Mike McClung was -- he

25  initiated all of this.  He emailed me I want to say right

1  after the last hearing saying that they were going to try to

2  get her in to the urologist, which they've done, a

3  gynecologist, and then he inquired, if I remember correct, as

4  to Dr. Abdullah's information.  And evidently they've done

5  that.  I didn't know that she was set for that this week.

6  That's the first that I've learned of it.  But if that's what

7  Mr. Johnson says is happening, I don't have any reason to

8  doubt that.

9          THE COURT:  Okay.  And then the reason I ask that

10  question is the Court has received testimony from

11  Dr. Abdullah, but he's not actually examined the plaintiff --

12  or the defendant, rather.  How do you wish to proceed?  It's

13  your motion.

14          MR. MAYBERRY:  Well, Your Honor, I mean --

15          THE COURT:  If you tell the Court that you wish to

16  proceed on the information that you've developed to this

17  point, the Court will take it under advisement.  Do you need a

18  moment to think about it?

19          MR. MAYBERRY:  Can I have a brief second, Your Honor?

20          THE COURT:  We will take a short recess and you can

21  talk with your client.  We will be in recess.

22      (Recess taken.)

23          THE COURT:  The record should reflect that we took

24  roughly a ten-minute recess, perhaps even longer.

25          Mr. Mayberry, what's your preference?

1          MR. MAYBERRY:  Yes, Your Honor.  I've counseled with

2   my client, and she would like to move forward with the hearing

3   today.  She has her scheduled appointment with Dr. Abdullah I

4   understand later this week.  That's going to happen one way or

5   the other, but she'd like to move forward today.

6          THE COURT:  The Court is prepared to take brief

7   argument, Mr. Mayberry.

8          MR. MAYBERRY:  Your Honor --

9          THE COURT:  Let me just say this just for the record.

10  Forgive me.  I asked you a question and then I interjected.

11         Do you rest?

12         MR. MAYBERRY:  We do, Your Honor.

13         THE COURT:  And, Ms. Rich, do you rest?

14         MS. RICH:  Yes, Your Honor.

15         THE COURT:  And now, Mr. Mayberry, your argument.

16         MR. MAYBERRY:  Your Honor, I think where we're at on

17  this case is the -- what we know is that the jail cannot

18  provide the best and most adequate care for Ms. Kuc given her

19  unique needs.  Dr. Abdullah has opined, and albeit without

20  seeing her, he has seen hundreds of individuals that have the

21  same needs.  He has performed surgeries to create the

22  neovagina.  He knows how to care for the neovagina.  He knows

23  what to do to prevent infection, what to do to prevent

24  potential catastrophe.

25             This is a situation where my concern has long been

1  not that the Pinellas County Jail or the medical staff there

2  is going to be doing anything maliciously, it's just that I

3  don't think considering the uniqueness of this case that they

4  necessarily are appropriate as a gatekeeper for the medical

5  needs.

6          This is an instance where they have been on notice

7  since March 26 that Ms. Kuc has needed either a hand shower or

8  has needed the ability to douche to properly cleanse herself.

9  They were also on notice at that time of the need for the

10 dilators which they took initiative to order prior to my

11 client's family getting them there.  They didn't do the same

12 thing with the douches.  So they have sat idly by since

13 March 26 without getting those to her.  Even if --

14         THE COURT:  The date, the March 26 date is based on

15 what?

16         MR. MAYBERRY:  That was the testimony from

17 Dr. Abdullah testifying that the appropriate way to cleanse

18 would be the hand shower or in the alternative the douche, but

19 similar testimony as today that the hand shower was much

20 preferred over the douche because of the volume of water, the

21 water pressure to properly cleanse out any bacteria to avoid

22 any colonization of bacteria.

23         THE COURT:  The reason I asked the date is I have a

24 copy of the transcript that was provided internally.  The date

25 indicated on the transcript -- I'd have to go back and look at

 1  the record -- was April 5.

 2          MR. MAYBERRY:  April 5 --

 3          THE COURT:  Was the testimony.

 4          MR. MAYBERRY:  Okay.  I'm sorry.  April 5.  March 26

 5  was the first time we were in.  I apologize, Your Honor.

 6  April 5.

 7          So regardless, they've been on notice.  Today is the

 8  22nd.  They've had 17 days.  Nothing has happened with that.

 9  Even if there is a burden on the client to ask for it because

10  they took initiative in the other issues to get the dilators

11  and whatnot and it's their burden to provide appropriate

12  medical care for any inmate, they haven't done that.

13          THE COURT:  What's your evidence that it was actually

14  requested by your client?

15          MR. MAYBERRY:  My client has told me that she

16  requested it.

17          THE COURT:  You are proffering that information.

18          MR. MAYBERRY:  Well, yeah.  The fact that it's not in

19  the medical record --

20          THE COURT:  Mr. Mayberry, I realize you are in full

21  advocate mode but, "well, yeah," is not necessarily the most

22  appropriate way of responding.

23          MR. MAYBERRY:  I don't mean to offend the Court, Your

24  Honor.  I apologize.

25          THE COURT:  That's okay.

1            MR. MAYBERRY:  You're exactly right.  I'm a little

2    emotional over this case.

3            My client has proffered to me that she has requested

4    the douche on April 14 and again on April 20 and that it has

5    not been provided on either occasion.  Medical records,

6    whether it's in there, whether it's not, I don't doubt that

7    there is often requests made by inmates in the jail or just

8    people at doctor's offices often that don't make it within the

9    medical records.

10            THE COURT:  Can I ask you a question, though, that I

11    have been meaning to ask you?  You started off by saying

12    that -- I believe these are your words -- that, and perhaps

13    you are being generous, that it's not the best and most

14    adequate care that she's going to get in the Pinellas County

15    Jail.  So what is the standard?  In other words, what is the

16    standard on a motion for release as it relates to a detained

17    defendant?  I suspect you would agree that the standard is not

18    the best and most adequate care.

19            MR. MAYBERRY:  I agree, Your Honor.  At the initial

20    detention, it would be -- I believe it's clear and convincing

21    evidence when it relates to danger to the community and

22    preponderance of the evidence when it relates to flight.  Now

23    that we're here coming back in, I believe the burden is to

24    initially show that there is information that the Court now

25    has that it did not have at the initial hearing.  And --

1        THE COURT:  But what's the standard as it relates to

2   the type of care that must be provided to a defendant, the

3   absence of which requires or would compel or evidence a need

4   for them to be released?  So what is that standard of care or

5   lack thereof?

6        MR. MAYBERRY:  Well, arguably, Your Honor, I believe

7   the standard of care with any medical professional in the

8   state of Florida is that standard of care that you could find

9   generally in the community.  I'm struggling to remember.  I've

10  done some medical malpractice work, but it's the accepted

11  standard of care for like medical professionals in the

12  community.  And if that's what we're operating on with this

13  case, I don't believe that that's been met.

14       THE COURT:  From what are you deriving that standard?

15  The medical malpractice world is one area from which to draw a

16  standard, but do you have case authority that that's the

17  standard to be evaluated or utilized by the Court on such a

18  situation as this where the argument is the person, the

19  defendant should not be detained because they're receiving a

20  type of care that is, however you want to define it, but below

21  a certain standard?

22       And if you're relying on the same standard of care

23  that exists in the private sector or outside the jail, what is

24  your case authority or authority at all for that proposition?

25       MR. MAYBERRY:  I don't have the case authority that I

can recite to Your Honor on the standard of care in a medical

malpractice suit.

THE COURT:  I'm not talking about a medical

malpractice suit.  What I'm talking about is in this

situation.  So I now have before me a defendant for whom you

are arguing release because the level of care doesn't meet a

standard.  What is that standard, and what is the authority

upon which you predicate that standard?

MR. MAYBERRY:  I'm not -- I don't know that I'm fully

understanding what you're asking me, Your Honor.  And I

apologize.

THE COURT:  That's okay.

MR. MAYBERRY:  I'm not trying to make it difficult.

THE COURT:  Maybe I'm wording it inartfully, and I'll

just interject because it -- what threshold has to be met in

order for your client to gain her release in a situation where

she would otherwise be detained?

MR. MAYBERRY:  I believe generally, Your Honor, I

have to show that there's information that we are showing to

you in this subsequent hearing that wasn't available or known

at the time of the initial.

THE COURT:  That I understand.  And I have plenty of

case authority that deals with that.  But what is the standard

as far as medical care or lack thereof?  Let's say you have

new information about medical care.  What standard of

1   inadequate medical care has to be shown?

2          MR. MAYBERRY:  I have not seen case law that relates

3   specifically to this issue, Your Honor.

4          THE COURT:  Not to this issue with a defendant in

5   this type of circumstance but just generally with respect to

6   medical care.  It could be any one of a number of infirmities

7   or other conditions or other situations, but what is the

8   standard?  You suggested initially that it has to be -- or

9   what is accepted outside with any layperson?

10          MR. MAYBERRY:  Yes, Your Honor, and to that point I

11   don't -- I don't know that there is a different standard of

12   care for an inmate versus an individual that's walking amongst

13   us when it comes to medical care provided by a medical

14   professional.

15          THE COURT:  And what I hear you to say as well is

16   that you don't have authority for that proposition; that's

17   what you surmise.

18          MR. MAYBERRY:  I don't have authority to represent to

19   this Court that there is a difference in that standard.

20          THE COURT:  Okay.

21          MR. MAYBERRY:  The standard that I summarized, I

22   guess, was the standard that I'm familiar with from medical

23   malpractice work and what typically I've seen that standard to

24   be.  So I think what -- I'm drawing the parallel in that

25   whether the person is in jail or whether the person is out of

1  jail, there shouldn't be -- there shouldn't be a different

2  standard of care in any capacity, whether the person is being

3  treated by a medical professional in a jail or whether they

4  are walking free amongst us, that medical standard of care

5  should be the same.  I don't have case law that says that

6  that's true.  I also don't have case law that says that it's

7  not.  I'm unaware of that.  I couldn't imagine that a Florida

8  court would say there is a different standard of care in the

9  jail than there is for someone walking around, but I can't

10 represent to Your Honor that I know that definitively.

11        THE COURT:  Let me ask you another question.  You had

12 originally argued in your motion that there were two deficits

13 here.  There was hormonal treatments as I recall, and the

14 second was with respect to dilators.  As you sit here now and

15 as the evidence has unfolded, it appears to the Court based on

16 the focus of Dr. Abdullah's testimony this afternoon is that

17 your principal argument has to do with hygiene and not the

18 dilators.

19        MR. MAYBERRY:  That's correct as we stand here today.

20 The original motion, my argument is that the jail cannot

21 adequately care for Ms. Kuc and her condition.  The dilators

22 have been provided.  They've given her the opportunity to use

23 those.  We know that.  The hormones, they have been able to do

24 that.

25        The other issue that I don't think can be passed by

1  and that was learned -- I'm not a medical professional

2  obviously.  But as we go, learned what else is necessary, has

3  been the need for the hand shower or the removable shower head

4  to properly cleanse her.  I felt that that's something that

5  the Court needed to know more about in order to make the

6  decision on retention or release.  My argument is based upon

7  Dr. Abdullah's testimony that the hand shower is far superior

8  than the douche for the reasons that he stated on the record,

9  running alongside the fact that the douche hasn't been

10  provided.  There's been a urinary tract infection that we know

11  is present that when tested for by the jail wasn't detected.

12  And but for the diligence of Mike McClung in scheduling

13  earlier the urologist, I don't know that they would have

14  detected it.

15        THE COURT:  Do we have evidence as to who ordered the

16  lab test on the urine?  Was it the urologist or was that at

17  the jail's offering?

18        MR. MAYBERRY:  The jail performed the urine test on

19  the 17th.  And then when she went to the urologist, they ran

20  her white blood cell numbers and they were high.  And they

21  also did a bladder ultrasound and detected the urinary tract

22  infection at that time.  And they've put her on --

23        THE COURT:  An antibiotic.

24        MR. MAYBERRY:  -- antibiotics.  So it's -- at this

25  point I -- the jail has not provided what they've been on

1  notice that she needs from the doctor.  They are not -- and

2  because of that or likely because of that, whether it is or

3  not, they are not detecting the urinary tract infections when

4  she has complained of it, gone to them.  It took an outside

5  doctor, a urologist to be able to detect that.

6         I think that what we now know is what they are

7  capable of or what they are not capable of and they haven't

8  done it.  And at this point, Your Honor, if it's allowed to

9  just continue on rather than her getting the appropriate care

10 that she needs to make sure that nothing catastrophic happens,

11 that she -- you know, whether it's a urinary tract infection

12 that could turn septic or whatever, this is a situation where

13 to allow the jail to just misdiagnose and then someone else

14 hopefully able to clean up something that hasn't been done,

15 it's her health that's at risk.  It's the possibility of her

16 becoming septic and dying.  It's the possibility of

17 irreversible damage to the neovagina canal.  These are things

18 that can be prevented but they aren't being prevented.  This

19 is my fear with them as the gatekeeper and her getting

20 adequate medical care at this point.

21        And that's why I say, you know, Mike emailed me after

22 our last hearing and set up everything for her to go to these

23 exterior doctors.  I don't know what shape she would be in at

24 this point had she not seen that urologist.  And ultimately,

25 Your Honor, where does it end at this point?  And I think it's

1  unique to her because she does have unique needs.  I don't

2  think that she -- the standard of care to this point has not

3  been up to par, and I think that that's become evident.

4          THE COURT:  Thank you, Mr. Mayberry.  I appreciate

5  your argument and advocacy.  And I've heard what you've had to

6  say.

7          And I wanted, as I indicated to counsel when I came

8  out on the bench, I looked for brief argument.  And I think I

9  have given you enough time and heard your argument fully.

10         Ms. Rich, so the government's response.

11         MS. RICH:  Just briefly, Your Honor.

12         I respectfully disagree with Mr. Mayberry's

13  characterization of the jail providing subpar medical care.

14  They have complied with every -- Mr. Johnson testified this

15  afternoon that he has complied exactly with the order that was

16  issued by this Court regarding the dilation being available

17  two hours twice a day that Ms. Kuc is not availing herself of

18  the opportunity to use at least on 12 occasions.  And the

19  other times when she did go, she was only there for 30 to 40

20  minutes.

21         The jail -- Mr. Johnson said that they would provide

22  the opportunity for her to douche as often as she wants to

23  every day, multiple times a day if that's what she wants to

24  do.  The jail has not said no to anything that's been asked of

25  it aside from the fact that they can't provide a hand shower.

1   Aside from that, the jail has been willing and able to provide

2   whatever care is needed, to include getting outside

3   recommendations from doctors, having her looked at internally,

4   providing the dilation devices, switching out the dilation

5   devices when she needs a larger one or increased girth for the

6   dilation process.  So the jail has accommodated everything

7   that's been asked of it from this Court and by Ms. Kuc.

8          And with the detection of the UTI, again, I don't

9   think it's fair to say that but for the urologist the jail

10  would have never found it.  The jail tested her two days

11  before she went to the urologist and she tested negative.  She

12  went to a urologist two days later and they found the UTI, but

13  there's no way of knowing if on April 20 she had complained of

14  pain they would have retested her.  And I specifically asked

15  Mr. Johnson does the jail test inmates for UTIs.  If they test

16  positive is medication prescribed, and the answer to all those

17  questions was yes.

18         So in the government's opinion the testimony has been

19  clear.  That but for the hand shower, the jail has been able

20  to provide all of the care that's necessary to treat Ms. Kuc's

21  medical needs.  And with respect to the hand shower, there is

22  an alternative to the hand shower.  It's not the most

23  desirable alternative, but it is a recognized alternative.

24  Dr. Abdullah recognizes that it is an alternative.  And the

25  jail has the ability to provide her two alternatives that

1   Dr. Abdullah says are recognized options if the hand shower

2   isn't available.

3            THE COURT:  And, Ms. Rich, I will ask the same

4   question of you that I asked of Mr. Mayberry.  What is the

5   standard here in terms of medical care?

6            MS. RICH:  I don't know the answer to that, Your

7   Honor.  But I would say that I think that the jail is

8   appropriately taking care of Ms. Kuc.  I mean, there's inmates

9   in a lot of the jails that have very specific medical needs.

10  There's inmates that are dying of cancer.  There's inmates

11  that are HIV positive, and they don't get to go home simply

12  because they have medical needs that require constant care and

13  unique medical needs.  The jail accommodates what those needs

14  are.  And that's exactly what they're doing in this case with

15  Ms. Kuc.

16           THE COURT:  Okay.  Thank you.

17           Anything further, Mr. Mayberry, in brief?

18           MR. MAYBERRY:  No, Your Honor.

19           THE COURT:  Okay.  The Court will take the matter

20  under advisement, which includes a subsequent review of the

21  testimony that was elicited today including by transcript

22  review.  So when the Court concludes its review, it will issue

23  its decision.

24           Anything further from the government in the meantime?

25           MS. RICH:  No, Your Honor.

1          THE COURT:  Thank you.

2          Mr. Mayberry?

3          MR. MAYBERRY:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          We will be in recess.

6      (Proceedings concluded at 4:56 p.m.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1  UNITED STATES DISTRICT COURT     )
                                    )
2  MIDDLE DISTRICT OF FLORIDA       )

3                  REPORTER TRANSCRIPT CERTIFICATE
```

4      I, Tracey Aurelio, Official Court Reporter for the United
5  States District Court, Middle District of Florida, certify, pursuant to *Section 753, Title 28, United States Code*, that
6  the foregoing is a true and correct transcription of the stenographic notes taken by the undersigned in the
7  above-entitled matter (Pages 1 through 45 inclusive) and that the transcript page format is in conformance with the
8  regulations of the Judicial Conference of the United States of America.

```
9

10                                /s    Tracey Aurelio
                                  _____
11                                Tracey Aurelio, RMR, RDR, CRR
                                  Official Court Reporter
12                                United States District Court
                                  Middle District of Florida
13                                Tampa Division
                                  Date:  May 3, 2021
14

15

16

17

18

19

20

21

22

23

24

25
```