1              UNITED STATES OF AMERICA
              UNITED STATES DISTRICT COURT
2              MIDDLE DISTRICT OF FLORIDA

3
                      - - -
4          HONORABLE CHRISTOPHER P. TUITE
        UNITED STATES MAGISTRATE JUDGE PRESIDING
5                      - - -

6   UNITED STATES OF AMERICA,   )
                                )
7          PLAINTIFF,           )
                                )
8   VS.                         ) NO. 8:21-cr-61-CPT-MSS
                                )
9   EMRAH KUC,                  )
                                )
10          DEFENDANT.          )
    _____)
11

12
              **<u>EVIDENTIARY HEARING/BOND HEARING</u>**
13
          REPORTER'S TRANSCRIPT OF PROCEEDINGS
14                  **MAY 26, 2021**
                  TAMPA, FLORIDA
15

16

17        MELISSA A. PIERSON, CA CSR 12499,
              IL CSR 084.003138, RPR
18        FEDERAL OFFICIAL COURT REPORTER
          801 N. FLORIDA AVENUE, 2ND FLOOR
19              TAMPA, FLORIDA 33602
              PH:  (813)301-5336
20          USDCtranscripts@gmail.com

21

22

23

24

25

1    **APPEARANCES OF COUNSEL:**

2    **ON BEHALF OF PLAINTIFF:**

3              MARIA CHAPA LOPEZ
              UNITED STATES ATTORNEY
4              BY:  MS. CANDACE RICH, ESQ.
              ASSISTANT UNITED STATES ATTORNEYS
5              400 N. TAMPA STREET
              ST. 3200
6              TAMPA, FL 33602
              (813) 274-6000
7              Candace.Rich@usdoj.gov

8

9    **ON BEHALF OF DEFENDANT:**

10             LAW OFFICES OF JASON M. MAYBERRY
              BY:  MR. JASON M. MAYBERRY, ESQ.
11             3902 HENDERSON BLVD
              ST. 208-136
12             TAMPA, FL 33629
              (813) 444-7435

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I-N-D-E-X

 2     WITNESS:

 3     Dr. Ahmed Abdullah

 4              Direct Examination by Mr. Mayberry:        8

 5

 6

 7

 8     Mr. Joel Johnson (Telephonic witness.)

 9              Direct Examination by Ms. Rich:           23
                Cross-Examination by Mr. Mayberry:        25
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              TAMPA, FLORIDA; MAY 26, 2021

 2                        - - -

 3              (COURT IN SESSION AT 9:04 A.M.)

 4                        *   *   *

 5         THE COURT:  Good morning everyone.

 6         Madam Clerk, if you could kindly call the case,

 7    please.

 8         MADAM CLERK:  Matter of the United States of

 9    America vs. Emrah Kuc, criminal Case No. 8:21-cr-61.

10         THE COURT:  If I could have appearances of counsel

11    for the record, beginning with the Government.

12         MS. RICH:  Good morning, your Honor.  Candace Rich

13    for the United States.

14         THE COURT:  Good morning.

15         MR. MAYBERRY:  Good morning, Your Honor.  Jason

16    Mayberry for Emrah Kuc.

17         THE COURT:  Good morning, Mr. Mayberry.

18         The Court's here for this -- I scheduled this

19    matter for evidentiary hearing in light of the filing that

20    the defendant submitted, filed at Document 50.

21         Mr. Mayberry, to buy into the stereotype of a

22    doctor's handwriting, but the Court could not glean from the

23    filing that you submitted what relevance these documents had,

24    if any, to the motions and relief sought in the case.  As a

25    result, as I mentioned, I scheduled this for evidentiary
```

```
 1   hearing, and I directed the parties to be prepared to have
 2   witnesses testify as appropriate.
 3             Mr. Mayberry, what is your client here for today?
 4             MR. MAYBERRY:  Your Honor, I have Dr. Abdullah
 5   here.  He can testify and enlighten the Court as to his
 6   findings when he evaluated Ms. Kuc, and he's also the author
 7   of those records and can also enlighten the Court as to what
 8   was written in the records.
 9             THE COURT:  Okay.  Thank you.
10             Ms. Rich, on your end, do you anticipate presenting
11   any testimony?
12             MS. RICH:  So I just have Mr. Johnson available by
13   phone at the jail.  I have spoken to Mr. Mayberry.  I think
14   our preference would be to do what we've done in the past,
15   which is have Mr. Johnson on the line when Dr. Abdullah
16   testifies so that he can listen to the doctor's
17   recommendations and respond, if appropriate, to anything he
18   hasn't already addressed with respect to what the jail is
19   able to provide.
20             THE COURT:  Any objection to that approach,
21   Mr. Mayberry?
22             MR. MAYBERRY:  No objection at all, Your Honor.
23             THE COURT:  I heard you say no objection?
24             MR. MAYBERRY:  No objection.
25             THE COURT:  Ms. Rich, do we have a phone number for
```

1    Mr. Johnson?

2              MS. RICH:  We do.

3              THE COURT:  Okay.  Madam Clerk, just for the

4    record, if you could call the Government's witness.

5              (Brief interruption.)

6              THE COURT:  Is it Mr. Johnston or Johnson?

7              MS. RICH:  Johnson, your Honor.

8              THE COURT:  Mr. Johnson, this is Judge Tuite.  Good

9    morning to you.

10             THE WITNESS:  Good morning, sir.

11             THE COURT:  Mr. Johnson, it's my understanding from

12   talking to the parties on the Ms. Kuc matter that you are

13   willing to devote some time here this morning to listening in

14   to the testimony of Dr. Abdullah, who will soon testify, and

15   then, if appropriate, the Government may have you testify

16   after that.  Is that your understanding?

17             THE WITNESS:  Yes, Your Honor.

18             THE COURT:  Okay.  Just so that you're clear,

19   Mr. Johnson, as to how this will proceed, Dr. Abdullah will

20   testify first on direct examination by Mr. Mayberry and then

21   cross by Ms. Rich, and possibly some additional testimony.

22   You will refrain from making any comment or observations

23   while Dr. Abdullah is testifying.  And once Dr. Abdullah has

24   concluded his testimony, I'll allow Ms. Rich some time to

25   confer with you about whether there's a need to have you

 1    testify based on her assessment.  Does that sound fair?

 2              THE WITNESS:  Sounds fair, Your Honor.

 3              THE COURT:  Okay.  With that, Mr. Mayberry, please

 4    call your first witness.

 5              MR. MAYBERRY:  Thank you, Your Honor.  Your Honor,

 6    the Defense would call Dr. Ahmed Abdullah.

 7              THE COURT:  Mr. Mayberry, if you could come to the

 8    lectern when you're examining Dr. Abdullah.

 9              Dr. Abdullah, you will need to come over here to be

10    sworn first.

11              THE WITNESS:  Okay.

12              MADAM CLERK:  Please raise your right hand.

13              THE WITNESS:  I do.

14              (Witness sworn.)

15              MADAM CLERK:  Thank you.  If you could please state

16    your name for the record when you're seated in front of the

17    microphone.

18              THE WITNESS:  My name is Dr. Ahmed Abdullah.  I'm a

19    plastic surgeon.

20              THE COURT:  Dr. Abdullah, if could you move the

21    microphone as close as possible and do us the kind favor when

22    you're speaking if you could speak slightly slower as I am

23    now doing than you would ordinarily speak.  Everything that

24    you're saying in open court this morning is being taken down

25    stenographically, and for the Court Reporter to make as clear

```
 1    and accurate a record as possible it helps if you slow your
 2    speed slightly.
 3            THE WITNESS:  I understand, Your Honor.
 4            THE COURT:  Thank you.  Mr. Mayberry.
 5            MR. MAYBERRY:  May I inquire?
 6            THE COURT:  You may.
 7                         DR. AHMED ABDULLAH
 8    Called as a witness herein, having been first duly sworn was
 9    examined and testified as follows:
10                       DIRECT EXAMINATION
11    BY MR. MAYBERRY:
12    Q.   Good morning, Dr. Abdullah.
13    A.   Good morning.
14    Q.   Thank you for coming in this morning.
15            Tell the Court what you do for a living?
16    A.   I'm a plastic surgeon.
17    Q.   Do you specialize in any specific area of plastic
18    surgery?
19    A.   I do all kinds of plastic surgery, mostly cosmetic and
20    reconstructive such as breast reconstruction and genital
21    recision.
22    Q.   Approximately -- approximately how many gender
23    reassignment surgeries have you done?
24    A.   Approximately 300, 400.  I don't know.  I can't keep
25    counting.  In the hundreds.
```

1  **Q.**   Okay.  Does that number include biological male to

2  transgender female?

3  **A.**   Yes.

4  **Q.**   How many approximately do you think you've done?

5  **A.**   400.  I can't tell you for sure.  I can't recall.  A

6  lot.

7  **Q.**   Do you regularly treat individuals who have had

8  surgeries going from biological male to transgender female?

9  **A.**   Yes.  That is the bulk of my practice.

10  **Q.**   Okay.  How long have you been doing that?

11  **A.**   About 30 years.

12  **Q.**   Doctor, are you familiar with a woman by the name of

13  Emrah Kuc?

14  **A.**   Yes.

15  **Q.**   How are you familiar with her?

16  **A.**   Well, I first heard of her when you called me and asked

17  me to give my opinion on this patient.  And then I met her a

18  few weeks ago in clinic when she was brought in for me to

19  examine her.

20  **Q.**   Do you remember the exact date of your meeting with her?

21  **A.**   No, sir.

22  **Q.**   Do you think it was about a couple weeks ago?

23  **A.**   Yes.

24  **Q.**   Okay.  And you mentioned that you examined her.  Can you

25  describe for the Court what you did during that examination?

```
 1    A.    During that examination I first had (inaudible) --

 2            THE COURT:  Doctor, you need to annunciate a little

 3    more clearly.  Again, it just helps the stenographer hear

 4    you.  There are some challenges.

 5            THE WITNESS:  I'll try, your Honor.  I'm a little

 6    soft spoken.  It's hard for me to know what I'm saying, how

 7    I'm saying it.  I'll try.

 8            THE COURT:  Thank you.

 9            THE WITNESS:  So I got a little bit of history from

10    her and then examined the area of concern, which is the

11    genital area.

12    BY MR. MAYBERRY:

13    Q.    Okay.  And generally what did you find with respect

14    to -- when you examined her?  What were your findings?  Can

15    you describe those for the Court?

16    A.    Yes.  So it was a male to female transgender transition.

17    And there was a urethrae.  There was a small clitoral --

18    clitoral is, C-L-I-T-O-R-A-L, clitoral segment, and then

19    neovagina, and then some labia, labia tissue, artificial

20    labia tissue made from the scrotal sac.

21    Q.    Would you classify that as a full genital transition

22    from male to female?

23    A.    Yes.  Full lower transition.

24    Q.    Okay.  Did you have an opportunity to examine

25    specifically the urethrae and the area around it?
```

1   **A.**    Yes, I did.  And that -- when I went in to examine, my

2   concern was, of course, a neovagina.  We talked about that in

3   court a few times regarding the neovagina and keeping it

4   clean, and dilation, and stuff.  And I found that to be

5   actually very adequate adage and shape, if you may.  But the

6   urethrae was a concern to me because I think it was -- when

7   we place -- because it's not normal female anatomy, they

8   insert -- it may not be the exact position -- appropriate

9   position.  Sometimes it's placed too much anterior forward,

10  so the urine stream goes too far forward.  Sometimes it's too

11  far back, and too far back then it is at a high risk as

12  opposed (inaudible) --

13          THE COURT:  Right there, Dr. Abdullah.  We lost you

14  just a little bit.  You slurred your speech just a tad.  You

15  were doing very well.  If you could just repeat that sentence

16  or two.

17          THE WITNESS:  Okay.  So, the placement of the

18  urethrae is artificial obviously.  Because we -- when we

19  fillet the penile shaft, the urethrae is gone.  So we have to

20  place it in a new hole, if you may, and then suture it so

21  that it looks like a female urethrae opening.  And to do that

22  we have a choice where we can put it.  It's not fundamentally

23  supposed to be there but that's what we do.

24          And so, depending on the surgeon's orientation at

25  that time when the placement of the urethrae is done, it can

1    be too far forward, just in the right position or too far

2    back.

3           And so, too far forward would mean the urine stream

4    would go straightforward which is not normal.  So you try to

5    place it as close to normal as possible, which is pointing

6    down.  But that's hard to do sometimes because it ends up

7    contracting, starting contracting and pointing further back.

8    Again, that placement is not that easy.

9           But -- so I found then Ms. Kuc was at -- the

10   urethrae is a little bit more posterior, back, if you may,

11   than -- than maybe I would have placed it, but, you know,

12   that's subjective.  That I'm not going to comment about the

13   placement ability or anything.  Maybe because of the

14   contraction or the scar or something that pulled it back.

15   But regardless, it was a backwards urethrae.

16          And then there is -- it ends up being in a pouch.

17   Literally it's -- kind of think of a cup with a urethrae hole

18   at the bottom of the cup.  And that obviously is a reservoir

19   for collection of mucus and things like that, bacteria, and

20   that's why I think she's probably getting more UTI's than

21   normal because of that cup-like structure that's formed.

22          And also, because it's more posterior than the

23   sense of getting bacteria contamination from the neovagina

24   and certainly from the rectum.  Because most people wipe

25   forward, and so the contamination of that and getting into

1     that cup area it becomes an issue because that -- there's a

2     bacteria there all the time.  And then, the urethrae is

3     directly connected to the bladder.  That's where the

4     infections occur.

5     BY MR. MAYBERRY:

6     **Q.**   So are -- correct me if I'm wrong, Doctor.  I don't want

7     to put words in your mouth.  But are -- the positioning of

8     the urethrae, is your concern with that because of bacteria

9     that can come from the neovagina, or from the actual urine

10    track stream possibly collecting urine within the cup that

11    you described or am I off base completely?

12    **A.**   Well, no, you're partially correct.  It's a combination

13    of all those factors obviously.

14           So the urine itself is sterile when it comes out.

15    Obviously when it sits in that cup area it's going to

16    eventually become colonized with bacteria.

17           And also, from the neovagina you get these mucosal

18    drippings, if you may, that can come forward and enter that

19    cup.

20           And then, of course, it is exposed to rectal

21    wipings can, and it's not a clean process so bacteria from

22    that.  So that now becomes a reservoir for bacteria from a

23    number of different sources, if you may, And -- in this case.

24    So that was -- that was -- that was the finding that was --

25    that was concerning to me after I examined the patient was

1    the full (inaudible) and I hadn't seen the patient yet.

2    **Q.**   What are the complications that can occur due to

3    bacterial colonization around the urethrae?

4    **A.**   Well, your UTI's.  Urinary tract infections.  The

5    urinary tract starts at the urethrae, the urethrae goes up

6    into the bladder, and the bladder then is connected to the

7    kidneys with these tubes called the ureters.  So that's the

8    -- that's the urinary tract.  And any infection can travel up

9    that tract all the way to the kidneys at times.  Usually it's

10   a UTI and if it's untreated it will travel, what we call

11   retrograde, or backwards towards the kidney.  Usually the

12   urinary tract infections can extend from the urethrae and

13   bladder.  And we treat them with antibiotics and they get

14   better.

15   **Q.**   Do you -- are you aware of Ms. Kuc's medical history

16   immediately prior to coming to see you?

17   **A.**   Not completely.  I just know she's had -- actually I did

18   ask her -- a couple of urinary tract infections.  So it's

19   unusual.  She said in the last 30 to 45 days or within

20   45 days she has had a couple of urinary tract infections.

21   **Q.**   I couldn't understand you.

22   **A.**   She had two urinary tract infections apparently in the

23   last month, month-and-a-half, something like that.

24           THE COURT:  Did you say two?

25           THE WITNESS:  That's -- that's my impression.

 1    BY MR. MAYBERRY:

 2    **Q.**    Is that - is that a normal thing --

 3    **A.**    No.

 4    **Q.**    -- for people to get two --

 5    **A.**    No.

 6    **Q.**    Okay.  Is it your belief that those urinary tract

 7    infections are caused by bacterial buildup around the

 8    urethrae or do you have an opinion on that?

 9    **A.**    Well, urinary tract infections can be caused by a number

10    of sources.  So, you know, when we -- when we look at what

11    the source could be, you look at the most obvious one.  And

12    the most obvious one is the reservoir that's formed and

13    usually it's the kind of reservoir that's found --

14              THE COURT:  Dr. Abdullah, forgive me.  If you could

15    go back and repeat those sentences, those last two sentences.

16    I had trouble hearing you clearly.

17              THE WITNESS:  Sure.  So, it's -- there are a number

18    of different sources from where urinary tract infections can

19    form.  But when you look at it, we always look and see what's

20    the most common source, and then, in this specific instance.

21    It's kind of like the old saying we have in medicine, when

22    you hear hoof beats you think horses not zebras.

23              MADAM REPORTER:  I'm sorry.

24              THE WITNESS:  You think horses not zebras when you

25    hear hoof beats.

1            So you look at the most obvious and most common

2     cause, which would be the urethrae opening where

3     contamination can occur, and then -- then the bacteria travel

4     retrograde or backwards into the bladder, etc.

5            So in her case because of that unusual pouch, I

6     think that is probably the most common area of contamination,

7     if you may.

8     BY MR. MAYBERRY:

9     **Q.**   Doctor, what are complications that a urinary tract

10    infection can cause?

11    **A.**   Well, certainly if you get multiple infection --

12    infections cause inflammation, and inflammation of the

13    urethrae can cause strictures or scar formation.  So

14    strictures from multiple infections can certainly affect the

15    urethrae, the bladder.  Multiple urinary tract infections of

16    the bladder can cause bladder issues.  And then certainly

17    going up the urethrae and kidney it can cause kidney damage.

18            THE COURT:  I'm sorry, that sentence you will have

19    to repeat if you could just again.  If you can articulate as

20    clearly as you can.

21            THE WITNESS:  So the question was, what kind of

22    complications can urinary tract infections cause?

23            Well, one urinary tract infection probably won't

24    cause much of anything.  But multiple urinary tract

25    infections over time can cause issues with different parts of

```
1    the urinary tract system starting with the urethrae.  The
2    urethrae is a very thin tube that connects the bladder to the
3    outside, and if you get that infection enough times, you can
4    get strictures or --
5              THE COURT:  Strictures?
6              THE WITNESS:  Strictures, which is scar formation.
7    So basically it restricts the flow because of scar there.  So
8    we see that fairly commonly in some of these that have had
9    multiple urinary tract infections.  And then, um, certainly
10   bladder -- you get bladder inflammatory processes, and then
11   ureters and kidneys.  I mean, the worst case scenario would
12   be multiple urinary tract infections that cause kidney
13   damage.  And then, of course, even one urinary tract
14   infection, if untreated, can cause sepsis, which is, of
15   course, life threatening.
16   BY MR. MAYBERRY:
17   Q.   What is sepsis?
18   A.   Sepsis is basically when the bacteria leaves the tissue
19   and gets into the bloodstream.  And then -- then -- that's --
20   obviously that can cause all kinds of organ failure and
21   things like that.
22   Q.   Okay.  Going back to the neovaginal canal, Doctor, you
23   testified earlier that you feel like the dilation has done
24   well, and that -- well, tell the Court what your feelings are
25   in terms --
```

**A.**   Yes.  So, you know, that was -- you know, after my last

few times we talked, the concern was dilation, was she

getting adequate dilation.  On examination the vaginal canal

seems to be pliable and soft and open and well dilated, or at

least at this point well dilated.

**Q.**   Did you make any findings as -- as -- with respect to

whether or not she can adequately cleanse or has been able to

adequately cleanse the neovaginal area?

**A.**   Well, when I -- when I examined her, it seemed fairly

clean.  There was a little bit of a smell, which -- which

showed me that it wasn't washed out.  But I couldn't see any

obvious, for lack of a better term, "gunk" or buildup.

**Q.**   Okay.  Now, in terms of appropriately cleansing the

neovaginal canal, what, in your opinion, is the most

effective way to do that?

**A.**   Probably the most effective way is water under pressure

directed directly into the opening, and then kind of washing

it out, which is -- we talked about hand showers or bidets or

those kind of apparatuses.  But the neovaginal canal in this

case is not as much a worry of mine as the pouch around the

urethrae.

        THE COURT:  I'm sorry, could you just repeat that

sentence, Doctor.

        THE WITNESS:  My main concern in this case is the

pouch around the urethrae opening.  That pouch is a -- is a

```
 1    -- is too small to just clean with the hands or finger.  It
 2    needs running water to clean it.
 3              THE COURT:  You said -- did you also say that the
 4    vaginal opening is not as much of a concern anymore now that
 5    you've seen it?  Did I --
 6              THE WITNESS:  Yeah.
 7              THE COURT:  It seemed as if you said something to
 8    that effect or making a comparison.
 9              THE WITNESS:  Yes.
10              THE COURT:  Okay.
11    BY MR. MAYBERRY:
12    Q.   Go ahead, Doctor.  I'm sorry.
13    A.   So -- so -- so -- so my concern is that in keeping the
14    vaginal canal clean is one thing, you know.  Again, it's -- I
15    don't see any other way of cleaning it than a direct jet of
16    water.  That's what I prescribe my patients to get a hand
17    shower cause that -- that's the easiest way to do -- to do
18    it.
19              But I think the pouch on the new urethrae, that's a
20    bigger concern to me because that would require not only a
21    jet of water, but also finger manipulation to keep it clean,
22    really keep it clean to prevent these recurrent UTI's.
23    Q.   What, in your opinion, would be the best producer of the
24    jet of water for cleansing?
25    A.   Well, the two things that I can think of are a bidet.  A
```

  1   bidet would be -- would be ideal, or a -- or a small hand

  2   shower.  Hand showers are similar to the shower head we get

  3   in a sink in the kitchen.  You pull out and you wash.  Those

  4   are -- those are -- those are considered hand showers.  They

  5   are very common in the -- in some countries to have in every

  6   bathroom.  Every toilet has one of those next to it.

  7        So those -- those -- so those produce enough power

  8   and jet and small enough stream, small enough area that it

  9   can really clean the -- the -- the area we're talking about

 10   well.

 11        Certainly a hand shower, you know, the pull-down

 12   shower from -- from the shower head and when you are in the

 13   shower.  The normal showers you have that can be used too

 14   because that can be directed down underneath and upwards.  So

 15   that, I think, would give you the kind of water pressure and

 16   the kind of volume you need to keep the area clean regularly.

 17   Q.   We talked about a perineal wash or a douche.  Can you

 18   explain for the Court, do you see a difference in cleansing

 19   with something like that versus a removable shower head?

 20   A.   A perineal wash, depending on the cost, a douche, there

 21   are multiple brands, multiple designs.  So, but I think the

 22   limiting factor in all of them is the volume of water, the

 23   volume of the cleaning fluid, which is water mostly, and the

 24   -- the pressure by which you can squirt it in there.

 25        And a douche usually comes with a nozzle.  So it's

```
 1    small for internal cleaning.  You put it inside the neovagina

 2    or vagina and you clean it, which makes no big difference to

 3    the water pressure and the volume.

 4    Q.   So is it your testimony that there needs to be more

 5    water pressure than a person can squeeze out of a bottle?

 6    A.   Agreed.  Yes.

 7    Q.   Is it also your testimony that there needs to be direct

 8    contact from that water consistently?

 9    A.   That's the whole idea.  Yes.

10    Q.   Doctor, do you have an opinion as to whether Ms. Kuc

11    will be able to properly cleanse herself without a removable

12    shower head or hand shower?

13    A.   Well, just having examined that pouch that would be

14    difficult to do, I think.  I mean, wipes won't do it, and

15    even a wipe cloth won't do it.  Because you need to get in

16    there and wash that area out with some -- something more

17    powerful than just, you know, squirting a little water in

18    there.  So I think that would be a -- that -- that would be a

19    concern.

20             MR. MAYBERRY:  I believe that's all I have at this

21    time.

22             THE COURT:  Thank you, Mr. Mayberry.

23             Ms. Rich, any cross-examine?

24             MS. RICH:  I don't have any questions.

25             THE COURT:  Okay.  Thank you, Doctor.  You may
```

1    stand down.

2              (Witness excused.)

3              THE COURT:  Ms. Rich, do you need a moment to

4    confer with Mr. Johnson about how you wish to proceed?

5              MS. RICH:  No, Your Honor.

6              THE COURT:  Okay.  Do you intend to call

7    Mr. Johnson?

8              MS. RICH:  I'll just ask him a few questions, yes.

9              THE COURT:  Okay.  Let me just double-check with

10   Mr. Mayberry.

11             Does that conclude your presentation?

12             MR. MAYBERRY:  It does, Your Honor.

13             THE COURT:  Do you rest?

14             MR. MAYBERRY:  We do.

15             THE COURT:  Okay.  Ms. Rich, if you intend to call

16   Mr. Johnson, we'll need to swear him in first.

17             MS. RICH:  Okay.

18             THE COURT:  Madam Clerk.

19             MADAM CLERK:  Mr. Johnson, can you hear me?

20             THE WITNESS:  I can.

21             MADAM CLERK:  If you could please raise your right

22   hand.

23             THE WITNESS:  I do.

24             (Witness sworn.)

25             MADAM CLERK:  Thank you.  If you could please state

1    your name for the record.

2              THE WITNESS:  Joel Johnson.

3                        **JOEL JOHNSON**

4    Called as a witness herein, telephonically, was examined and

5    testified as follows:

6                      **DIRECT EXAMINATION**

7    **BY MS. RICH:**

8    **Q.**   Good morning, Mr. Johnson.

9    **A.**   Good morning.

10   **Q.**   Just so the record's clear, I know you testified

11   previously regarding these issues, but with respect to the

12   hand shower, is it still the case at the jail that there is

13   no hand shower available for Ms. Kuc to use?

14   **A.**   That is correct.

15   **Q.**   Have there been any changes to the care being provided

16   to Ms. Kuc since the last time you testified regarding this

17   matter?

18   **A.**   Yes.  Since then we got her a perineal irrigation

19   bottle.  She mentioned that didn't provide enough pressure so

20   -- and it was hard to angle it correctly.  So we got her a

21   different style that is similar to what would be given to a

22   mother after she delivered to clean that area.

23              And since then we started providing her a douche to

24   use as well.

25   **Q.**   Now, as to the perineal bottle that you provided, is

 1    that something that she's able to use whenever she wants?

 2    **A.**   Correct.   That's something she would keep on her person.

 3    She can go into the shower and use it as many times as she

 4    wants throughout the day.

 5    **Q.**   And with respect to the dilation, has that continued to

 6    be available to Ms. Kuc whenever she requests it or asked to

 7    dilate?

 8    **A.**   It has.   We offer it to her three times a day.   She

 9    generally refuses the nighttime dilation.

10    **Q.**   Okay.   Now, with respect to the douching, was there a

11    delay in getting access to that type of cleansing to Ms. Kuc?

12    **A.**   There was.   I had a discussion with the nurse

13    practitioner that was caring for her immediately after our

14    court case, and I think she felt that the perineal irrigation

15    would be sufficient.   And when there were continued

16    complaints, I went back to her and she agreed to order this.

17    For some reason our pharmacy didn't fill it initially, and so

18    there was a bit of a delay in us getting the device.   Once I

19    found out that she hadn't received it yet, I spoke with the

20    provider and we spoke with pharmacy person and now she does

21    have that device available to her.

22    **Q.**   So that's now available to her whenever she requests it?

23    **A.**   Well, it's ordered weekly.

24    **Q.**   And who issues that -- who made the determination that

25    it would be available on a weekly basis?

1    **A.**    The nurse practitioner.  That's the way she put it in

2    the computer.  So they give it to her once a week now.

3    **Q.**    And when did that order go into effect?

4    **A.**    They first gave her the device on the 21st of this

5    month.

6    **Q.**    Okay.

7              MS. RICH:  I don't have any other questions.

8              THE COURT:  Thank you.

9              Mr. Mayberry, any cross-examination?

10             MR. MAYBERRY:  Briefly, Your Honor.

11                        **CROSS-EXAMINATION**

12   **BY MR. MAYBERRY:**

13   **Q.**    Mr. Johnson, you said that the douche was received on

14   May 21st?

15   **A.**    Yes, sir.

16   **Q.**    And you mentioned that it was requested at an earlier

17   date.  What was that earlier date?

18   **A.**    I'm not sure of the exact date.  I can find it possibly

19   here.  (Brief pause.)  It was ordered on the 7th of this

20   month.

21   **Q.**    Do you have any notes on the jail following up on where

22   the order was over the course of the 14 days between its

23   order and its receipt?

24   **A.**    Yeah, there --

25   **Q.**    I guess a better question, Mr. Johnson, would be, was it

 1   ever followed up on between the date it was ordered and

 2   received as to its whereabouts?

 3   **A.**   Yes.  I recall reading a note shortly thereafter.  I

 4   have to go through the chart to find it.  So there was one

 5   nurse that made efforts to get the device.  I do recall

 6   seeing that in the chart.

 7   **Q.**   Do you know when that was?

 8   **A.**   Exactly, no.  Again, I'm trying to find it now, but it

 9   could take some time.  There are many notes in the chart.

10   **Q.**   Okay.  You mentioned that a nurse practitioner has

11   ordered for her to be allowed to use the douche once a week?

12   **A.**   That's correct.  That's the way she ordered it.

13   **Q.**   Beginning on the 21st of May?

14   **A.**   That's the first day that the device was available.

15   **Q.**   Okay.

16              MR. MAYBERRY:  I have nothing further, Your Honor.

17              THE COURT:  Thank you.  Any redirect, Ms. Rich?

18              MS. RICH:  No, Your Honor.

19              THE COURT:  Mr. Johnson, thank you for making

20   yourself available.  That will conclude your testimony.

21              THE WITNESS:  Yes, Your Honor.

22              THE COURT:  Any reason, Ms. Rich, for Mr. Johnson

23   to remain on the line?

24              MS. RICH:  No, Your Honor.

25              THE COURT:  Mr. Mayberry?

```
1              MR. MAYBERRY:  I'm sorry, Your Honor?

2              THE COURT:  Any reason to have Mr. Johnson remain

3    on the line?

4              MR. MAYBERRY:  No, Your Honor.

5              THE COURT:  Okay.  Thank you, Mr. Johnson.  You are

6    excused.

7              THE WITNESS:  Thank you, Your Honor.

8              (witness excused.)

9              THE COURT:  Ms. Rich, anything else besides

10   Mr. Johnson, by way of evidence?

11             MS. RICH:  No, Your Honor.

12             THE COURT:  Okay.  You rest?

13             MS. RICH:  Yes.

14             THE COURT:  Okay.  Mr. Mayberry, the Court will

15   take brief argument.

16             MR. MAYBERRY:  Your Honor, my argument is much the

17   same as it has been.  This has obviously been a case of first

18   impression for me coming in and trying to learn the medical

19   behind this while also trying to make an argument to the

20   Court.  And it has been a learning experience, admittedly,

21   and I -- it seems that as we go on this, from when the motion

22   was originally filed, that I'm learning more about the

23   medical.  And so, my argument is, while the spirit of it is

24   the same, I'm learning more as we go.  And I think the Court

25   -- obviously you're hearing the same things that I am.
```

1          Your Honor, the issues that are coming up over the

2     course of this, I think it all revolves around a person's

3     ability to keep themself clean in order to keep themself

4     healthy in order to avoid multiple infections that can lead

5     to further complications.

6          Dr. Abdullah has testified before the Court, and I

7     believe it's three times, most recently here in person.  He

8     has come of his own volition.  I have not subpoenaed him.  I

9     have not paid him.  I have not done anything.  This man is

10    here because he is wanting to apprise everyone here what's

11    necessary for my client.

12         Your Honor, I believe that this is material

13    information that couldn't have been known.  There's nothing

14    that we could have known.  I was not there for the initial

15    detention hearing.  But the inability to cleanse and care for

16    herself in a jail has been something that has been learned

17    over the course of time.

18         What they have is just not adequate.  And I say

19    that with all due respect to everyone in the jail and

20    everyone that's working there.  It's just not adequate.  She

21    needs what Dr. Abdullah has said.  She needs this jet of

22    water.  She needs this most basic thing to cleanse herself to

23    keep herself healthy to avoid urinary tract infections or

24    worse.  And if it's not something that the jail can do, I

25    believe that that's information that we now have that's

1   material that would allow for this Court to reconsider her

2   detention.

3           This is a situation that she's been given this

4   perineal wash, which she has been able to use and has used

5   and she's still getting these urinary tract infections.

6           This jail has been on notice.  Mr. Johnson has been

7   present, I believe, for all but the very first hearing, and

8   has been on notice that at -- you know, at that time, at the

9   very minimum, she needed something more than a perineal wash

10  and she just got it on the 21st.  And the nurse practitioner

11  is ordering for her to be able to use it once a week, and

12  that's -- we've heard what Dr. Abdullah has to say.

13          And again, with all due respect to the good people

14  at the jail, this is a matter of Dr. Abdullah's expertise in

15  seeing this, and operating on people, and treating people

16  daily, and having seen this over and over again.

17          And so I would -- I would offer to the Court that

18  he is in the best position and is the best witness to testify

19  and explain what an individual needs that has both undergone

20  this kind of thing and it's just not there.  And the jail

21  can't do it.  And even the second best thing that could

22  possibly be there they're not getting it for her.  And this

23  is where we are as we stand here on May 26th.

24          And I have some emotion in my voice, Your Honor,

25  because I'm worried about my client.  And that emotion --

 1    probably a courtroom is not a place for emotion but this is

 2    who I am and I'm sorry.

 3            I believe, Your Honor, that this is a factor that's

 4    present that couldn't have been known at the beginning.  I

 5    believe this is a factor that is serious, and I believe this

 6    is a factor that the Court, with all due respect, should

 7    consider in making an analysis as to whether or not she can

 8    safely be housed at the jail and remain there.

 9            I've focused more with this argument on medical.  I

10    can turn to the 3142 factors.  I guess with that those have

11    been argued at the initial detention hearing.  If your Honor

12    would reconsider this issue of detention, everything this

13    family has been willing to do they're still willing to do.

14    They're willing to put up the entirety of their home to

15    secure a bond.  They're willing to offer third-party

16    custodianship.

17            Pretrial Services had made a recommendation of GPS.

18    My client's willing to take it a step farther and accept RF

19    monitoring where she is just on house -- home confinement.

20    All the way down to the Adam Walsh Act compliant conditions,

21    to the extent of not allowing her to even have a credit card

22    if there's a concern about a flight risk, or the obvious

23    concern of dangerousness to society, keeping minors away.

24    All of those conditions I believe she would abide by.  And I

25    believe that her family is in a position where they would

 1    support that and take it a step further and act as an

 2    officer -- I'm sorry, as an agent of the Court to ensure that

 3    those conditions are complied with.

 4         Her mother has been here every time she could be.

 5    She was here two days after a major surgery to support and

 6    that's -- that's not going to change throughout the course of

 7    this case.  And that wouldn't change whether she's released

 8    or not released.  That's here.  That's the kind of support

 9    system that my client has.

10         I understand the nature of the allegations.  I

11    understand the nature of the charges.  Based on the testimony

12    from Dr. Abdullah, the medical needs, the needs to cleanse,

13    and the fact that I do believe my client has adequate

14    assurances that she would not flee and not present herself as

15    a danger to the community, I'd ask the Court to reconsider

16    the issue of detention and find that release is appropriate

17    under the conditions that the Court deems appropriate.

18         THE COURT:  Thank you, Mr. Mayberry.

19         Ms. Rich.

20         MS. RICH:  I don't have much in the way of argument

21    except to just touch on what Mr. Mayberry has stated

22    regarding detention.  It was known to the Court at the time

23    of the original detention hearing all of the measures that

24    could have been put in place to ensure that Ms. Kuc wasn't a

25    flight risk, to include the family support that was there.

1    So that was known at the time of detention that was

2    considered by your Honor, and Your Honor ruled that the

3    Defense could not overcome the presumption in favor of

4    detention, and ruled to detain Ms. Kuc at that time.

5            The only new issue for the Court is essentially

6    whether or not, not having a hand shower at the jail is a

7    reason to -- well, is enough to overcome the presumption,

8    essentially, in favor of a detention hearing and the

9    Government's position is that it is not.

10            She has had two urinary tract infections since

11   being in custody, and it's undisputed that the jail does not

12   have a hand shower to provide to Ms. Kuc.

13            THE COURT:  If I could have you just pause there.

14   The jail does have a hand shower, as I recall, but it's for

15   the men not for the women.

16            MS. RICH:  Correct, Your Honor.

17            THE COURT:  So why could it not be the case that

18   something not in the ordinary, but I think the argument that

19   Mr. Mayberry made -- is making is that this is not an

20   ordinary case.  Why could not the jail have arranged for

21   Ms. Kuc to avail herself of that hand shower under certain

22   circumstances?

23            MS. RICH:  I believe the testimony regarding that

24   particular hand shower was that there was no way for the jail

25   to ensure her the privacy that certainly Ms. Kuc would want

1    in order to be able to use that hand shower.  That was my

2    understanding of why that hand shower would not be something

3    that would be an option for Ms. Kuc.

4            With respect to the other option --

5            THE COURT:  Is there something about a hand shower

6    that it can't be affixed to some other piece of plumbing in

7    the building?

8            MS. RICH:  I don't know, Your Honor.  I've never

9    installed a hand shower.  I don't know what's involved with

10   that.  I don't know whether or not that's something the jail

11   could, in fact, do.  I don't know.

12           THE COURT:  Have you had occasion to ask?

13           MS. RICH:  No.  I have not asked Mr. Johnson that

14   question.

15           Just continuing my argument.  I would just -- the

16   Court knows that there are other options that are available

17   to Ms. Kuc.  They're not the most ideal options according to

18   Dr. Abdullah, but there are other options, which includes the

19   perineal bottle that's been provided to Ms. Kuc that she can

20   use whenever she chooses.

21           Also the douching.  Obviously there was a delay and

22   Mr. Johnson admitted that there was a delay in getting her

23   that douche, however, it's now been ordered as of May 21st.

24   It's being ordered on a weekly basis.

25           The jail has been compliant with all the other

1    orders that its been issued regarding Ms. Kuc's medical care.

2    So if a Doctor says she needs to be douching more than once a

3    week, I'm sure an Order could be entered and provided to the

4    jail saying douching needs to be provided to Ms. Kuc more

5    than once a week.

6           But given everything this Court has heard over a

7    series of hearings since the original Order of Detention was

8    entered, the Government's position would be that nothing has

9    been presented to overcome the presumption in favor of

10   detention given the weight of the evidence against Ms. Kuc,

11   the potential for flight risk, and the charges that are

12   currently pending against Ms. Kuc.

13          THE COURT:  Okay.  Thank you.  Any brief rebuttal,

14   Mr. Mayberry?

15          MR. MAYBERRY:  No, Your Honor.

16          THE COURT:  Okay.  Mr. Mayberry, the Court, at the

17   last hearing, had asked you if that concluded your proof, and

18   my recollection is you had represented that it did, at which

19   point the Court intended to take the matter under advisement.

20   I understand that you came upon the records that you did that

21   are found at Document 50 and submitted them to the Court.  In

22   order for the Court to move forward with this matter, it

23   looks to you as to whether this concludes what you reasonably

24   foresee is your proof on this issue.

25          MR. MAYBERRY:  Your Honor, I cannot imagine

```
 1    anything further that I can bring to the Court on this.  If I
 2    could have one moment to speak with my client?
 3              THE COURT:  Absolutely.
 4              (Brief interruption.)
 5              MR. MAYBERRY:  Your Honor, I don't have anything
 6    else to put forward.
 7              THE COURT:  Okay.  Anything further at all from the
 8    Government?
 9              MS. RICH:  No, Your Honor.
10              THE COURT:  Thank you.
11              Mr. Mayberry, anything further?
12              MR. MAYBERRY:  No, Your Honor.
13              THE COURT:  Thank you to you all.  We will be in
14    recess.
15              CSO OFFICER:  All rise.
16              (Court adjourned at 9:49 a.m.)
17
18
19
20
21
22
23
24
25
```

1                    **CERTIFICATE OF REPORTER**

2

3     COUNTY OF HILLSBOROUGH     )

4                                )  SS.

5     STATE OF FLORIDA           )

6

7     I, Melissa A. Pierson, Official Court Reporter, Registered

8     Professional Reporter, in and for the United States District

9     Court for the Middle District of Florida, do hereby certify

10    that I reported, stenographically, the foregoing proceedings

11    at the time and place hereinbefore set forth.  And I do

12    further certify that this is a true and correct transcription

13    of my stenographic/realtime notes.

14

15

16    DATED:  6/8/2021

17

18    S:/MELISSA A. PIERSON

19    MELISSA A. PIERSON, CA/CSR 12499

20    IL/CSR 084.003138, RPR

21    FEDERAL OFFICIAL COURT REPORTER

22

23

24

25